**Sean McMANUS, Plaintiff,**

v.

**DOUBLEDAY & COMPANY, INC., Russell Warren Howe and Sarah Hays Trott, Defendants.**

**No. 78 Civil 377.**

United States District Court, S. D. New York.

May 28, 1981.

O'Dwyer & Bernstien, New York City, for plaintiff; Frank Durkan, New York City, of counsel.

Satterlee & Stephens, New York City, for defendant Doubleday & Co., Inc.; Robert M. Callagy and Nancy K. Cassidy, New York City, of counsel.

Interdonato, Lombard, Reilly & Comstock, Washington, D. C., for defendant Sarah Hays Trott; James T. Reilly, Washington, D. C., of counsel.

Mark Gilder, Silver Springs, Md., for defendant Russell Warren Howe.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Father Sean McManus, a Roman Catholic priest of the Redemptorist Order in Baltimore, Maryland, commenced this action against the defendants Russell Warren Howe and Sarah Hays Trott, the authors of a nonfictional book entitled "The Power Peddlers," and Doubleday & Company, Inc., the publisher, charging them with libel. The book, published in February 1977, is an investigative report of foreign lobbies and lobbyists, and the influence they wield over American foreign policy. The alleged libel appears on page 391 of the book, in the midst of a subchapter on the Irish lobby. It consists of a single statement that "Father McManus' Irish Embassy file bears the mention 'homicidal tendencies.'" Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the motion must be denied as to the author of the statement in question, defendant Howe, but granted as to his co-author and publisher, defendants Trott and Doubleday.

A threshold issue is whether the attribution of "homicidal tendencies" to plaintiff is a statement of fact or opinion. On this motion, the issue is for the Court to resolve.[1] Expressions of one's opinion of another, however unreasonable or vituperative, since they cannot be subjected to the test of truth or falsity, cannot be held libelous and thus are entitled to absolute immunity from liability under the First Amendment.[2] On the other hand, misstatements of fact, when made with actual malice, are unprotected by the Constitution. Defendants contend that the attribution "homicidal tendencies" is mere epithet or hyperbole and thus entitled to absolute immunity as an expression of opinion.[3]

However, the contention that a statement is an "opinion" and not a "fact" must be examined against the background of the circumstances under which it was used by the author. Defendant Howe was the author of the statement in question. The essence of the defendants' position is that Howe was reporting factual information which had been conveyed orally to him by an official of the Irish Embassy whom he had interviewed during the course of his investigative reporting to obtain material for inclusion in the book. It is now undisputed that at no time was Howe shown, nor did he see, any card containing a notation that plaintiff had "homicidal tendencies" and indeed it is conceded that the index card bears no such notation. Opinions based on false facts are actionable against one who had knowledge of the falsity or probable falsity of the underlying facts.[4]

Moreover, the Irish subchapter in which the allegedly libelous statement is

1. *Letter Carriers v. Austin,* 418 U.S. 264, 282, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745 (1974); *Buckley v. Littell,* 539 F.2d 882, 888 (2d Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 381, 397 N.Y. S.2d 943, 950, 366 N.E.2d 1299, 1306 (1977).

2. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974); *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Cir. 1977); *Buckley v. Littell,* 539

F.2d 882, 893 (2d Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

3. *Letter Carriers v. Austin,* 418 U.S. 264, 282–87, 94 S.Ct. 2770, 2780–83, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Pub. Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970).

4. *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Civ. 1977); *Kakiloff v. Dunn,* 27 Md.App. 514, 343 A.2d 251, 262 (1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2228, 48 L.Ed.2d 832 (1976).

contained indicates that it would be entirely reasonable for a jury to take the words "homicidal tendencies" in their literal rather than hyperbolic sense. The subchapter focuses on lobbyists in America connected with or sympathetic to the Provisional Irish Republican Army ("IRA"), one of the more provocative of the various factions seeking independence from British rule for Northern Ireland. The subchapter is replete with references to violence, gun-running, and assorted other criminal acts. There is no claim that these are anything but factual assertions. Indeed, the very sentence that contains the allegedly libelous statement also refers to plaintiff's brother who died in the IRA. Clearly, real violence is a substantial focus of the subchapter, and it would not be unreasonable for an average reader to take the "homicidal tendencies" statement in the same light.

In attempting to counter this conclusion, defendants point to a statement two pages earlier in the book reporting that the Irish Embassy's file card on another IRA supporter labels him as "rabid." Defendants contend that just as no reasonable reader would infer from this statement that the individual referred to literally had been bitten by a rabid animal, so, too, no such reader would understand the phrase "homicidal tendencies" to attribute characteristics to plaintiff that would render him unfit to continue in his calling as a priest, that would impute insanity or impairment of his mental faculties or that would imply he had murderous proclivities against those opposed to his views or to those of the group with which he was affiliated. However, while a literal reference to rabies would be out of place in an article on supporters of violence in Northern Ireland, a literal reference to homicide would not be. Thus while the former statement might be hyperbole or epithet, the latter statement, in this context, reasonably could be viewed as a statement of fact.

Defendants also argue that the fact the phrase "homicidal tendencies" appears in quotation marks in the relevant sentence stresses its hyperbolic meaning and renders a literal interpretation unreasonable. However, since the sentence in which the phrase appears claims to be quoting plaintiff's Irish Embassy file card, the quotation marks could reasonably be understood to imply simply that the file card contains the words quoted. The average reader need draw no inference at all from the quotation marks that the phrase was meant only rhetorically. Accordingly, for the purposes of this motion, the phrase in question must be viewed as a statement of fact. Taking the phrase literally, as a jury reasonably could do, it charges plaintiff with the proclivity to engage in homicidal acts. This factual component of the charge precludes finding it a mere expression of opinion: "When an [alleged] 'opinion' is more than a derogatory comment but is laden with factual content, such as charging the commission of serious crimes," the statement is not entitled to the absolute First Amendment immunity accorded expressions of opinion.[5] This ground for summary judgment thus must be rejected.[6]

Having determined that the alleged libel can be construed as a statement of fact, the Court next must address whether plaintiff is a public figure or a private person for the purpose of establishing the standard of fault to govern this case. This determination must be made based upon what a reasonable person looking at the

---

**5.** *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 63 (2d Cir. 1980) (Friendly, J.).

**6.** *Compare Edwards v. National Audubon Society*, 556 F.2d 113, 121 n.5 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) (accusation that scientists are "paid liars" not opinion) *and Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 381–82, 397 N.Y.S.2d 943, 951, 366 N.E.2d 1299, 1307 (1977) (accusation that judge is "probably corrupt" not opinion) *with Buckley v. Littell*, 539 F.2d 882, 890–94 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) ("fascist," "radical right," and "fellow traveler," because of tremendous imprecision of those terms in realm of political debate, are expressions of opinion, not fact) *and Loeb v. New Times Comm'ns Corp.*, 497 F.Supp. 85, 91 (S.D.N.Y.1980) ("near-Neanderthal" is opinion).

entire situation would conclude.[7] There is little doubt that plaintiff is a public figure. As outlined in *Gertz v. Robert Welch, Inc.,*[8] one type of public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."[9] This type of "limited-purpose public figure"[10] "thrust[s] [himself] to the forefront of [a] particular controvers[y] in order to influence the resolution of the issues involved ... [thereby] invit[ing] attention and comment."[11] The affidavits and deposition transcripts submitted indisputedly demonstrate the intensity of the debate over the independence of Northern Ireland, not only in Britain and Ireland but also in the United States, and plaintiff's active involvement in this debate. The Northern Ireland dispute thus clearly is a public controversy.[12] Plaintiff is the National Coordinator of the Irish National Caucus, a lobbying organization and umbrella group for numerous Irish-American organizations, and the author of the Position Paper of the Caucus. He is well known in England, Ireland and Irish circles in the United States, for his views on the political conflict in Northern Ireland. He has appeared frequently on radio and television broadcasts and before large audiences throughout the United States to espouse his views on the conflict in Northern Ireland. It thus is evident that plaintiff has injected himself into the public controversy over Northern Ireland and has played a substantial role in that controversy. He thus must be classified as a public figure for the purpose of comment on these activities.[13]

Plaintiff seeks to overcome this conclusion by invoking language in *Hutchinson v. Proxmire.*[14] In *Hutchinson,* the Supreme Court ruled that a scientist was not a public figure simply because he had applied for and received federal grants to support his research. Among the rationale for the conclusion advanced by the Court was the argument that plaintiff's "activities and public profile [were] much like those of countless members of his profession."[15] Plaintiff argues that, likewise, his activities were no different from those of anyone else in his Order who had been assigned to carry out his "civil rights" duties. Plaintiff's argument ignores a crucial distinction between his case and *Hutchinson.* The *Hutchinson* plaintiff had not attempted to enter a public controversy until after the libel was directed toward him,[16] whereas the plaintiff in this case was actively involved in the debate on Northern Ireland well before publication of the Power Peddlers.

Moreover, plaintiff's argument fails of its own logic. If, as plaintiff contends, the public figure category must exclude people who have not distinguished themselves from others in their profession, then professions whose members previously have been thought typical public figures would no longer find these persons so classified. From politicians to baseball players to movie stars, libel plaintiffs who by virtue of their activism in public debate, notoriety, or access to channels of rebuttal traditionally have been assumed "all-purpose" or "general" public figures[17] suddenly would find

---

7. *Waldbaum v. Fairchild Pub'ns, Inc.,* 627 F.2d 1287, 1293–94 (D.C.Cir.1980).

8. 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

9. *Id.* at 351, 94 S.Ct. at 3012.

10. *Waldbaum v. Fairchild Pub'ns, Inc.,* 627 F.2d 1287, 1292 (D.C.Cir.1980).

11. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

12. *Waldbaum v. Fairchild Pub'ns, Inc.,* 627 F.2d 1287, 1296–97 (D.C.Cir.1980); *cf. Time,*

*Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976).

13. *See Waldbaum v. Fairchild Pub'ns, Inc.,* 627 F.2d 1287, 1297–98 (D.C.Cir.1980).

14. 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

15. *Id.* at 135, 99 S.Ct. at 2688.

16. 443 U.S. 134–35, 99 S.Ct. at 2687–88.

17. *Waldbaum v. Fairchild Pub'ns, Inc.,* 627 F.2d 1287, 1294–95 (D.C.Cir.1980).

themselves exempt from this classification simply because the qualities that made them public figures are shared either equally or to a greater or lesser degree by others in their profession. While the likeness between a plaintiff's activities and those of other members of his profession may be a factor in making the public figure determination, it is only one of several such factors. Members of certain professions are simply more likely than others to enter a public controversy or to have access to means of rebuttal, and thus, despite a similarity to their brethren, will tend more frequently to be found public figures.

At oral argument, plaintiff also sought to escape public figure status by arguing essentially that his involvement in the Northern Ireland controversy was involuntary since, being from a Catholic community in Northern Ireland, he was simply drawn into it, first in his homeland and later, upon his transfer to Baltimore, in the United States. The argument must fail for two reasons. First, the public figure category as defined in *Gertz* clearly includes individuals who are "drawn into" a public controversy.[18] Second, that plaintiff's involvement in the controversy exceeds that of most of his compatriots belies the view that in any meaningful sense his involvement was involuntary.

As a public figure, therefore, plaintiff cannot recover for the alleged libel unless he establishes with "convincing clarity" that defendants published it with actual malice, that is, knowledge of falsity or reckless disregard for the truth.[19] Reckless disregard for the truth is measured not "by whether a reasonably prudent man would have published or would have investigated before publishing," but by whether defendants "in fact entertained serious doubts as to the truth of [their] publication."[20] Only if defendants published the relevant comment with a "high degree of awareness of [its] ... probable falsity" can they be found to have harbored actual malice.[21]

■ Although for some time it was thought that, given the chilling effect of simply defending a libel suit, summary judgment in cases requiring proof of actual malice would be the rule rather than the exception,[22] this view was called into question by Chief Justice Burger's footnote in *Hutchinson*, which indicated that since proof of actual malice raises the issue of a defendant's state of mind, it does not lend itself readily to summary disposition.[23] The Second Circuit has therefore concluded that, rather than favoring summary judgment in libel cases, summary judgment motions are to be treated no differently from such motions in other cases, and that the chilling effect of merely defending a libel suit should be disregarded.[24] Upon a summary judgment motion by a defendant, the plaintiff's version of contested facts is to be accepted and then examined in light of the actual malice rule to see if any material facts are in dispute.[25] To grant a defendant's summary judgment motion the Court must be able to say that a jury could not reasonably find actual malice with convincing clarity.[26]

---

**18.** 418 U.S. at 351, 94 S.Ct. at 3012; *cf. Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976).

**19.** *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335–37, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964).

**20.** *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

**21.** *Id.; see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974).

**22.** *See, e. g., Washington Post Co. v. Keogh*, 365 F.2d 965, 967–68 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

**23.** 443 U.S. at 120 n.9, 99 S.Ct. at 2680 n.9.

**24.** *Yiamouyiannis v. Consumers Union*, 619 F.2d 932, 940 (2d Cir. 1980); *see Loeb v. New Times Comm'ns Corp.*, 497 F.Supp. 85, 94 (S.D. N.Y.1980).

**25.** *Yiamouyiannis v. Consumers Union*, 619 F.2d 932, 940 (2d Cir. 1980).

**26.** *Id.*

■ In this case, the allegedly libelous statement was based on an interview in July 1975 by defendant Howe with an official of the Irish Embassy in Washington, D. C., whose name has been withheld for his protection. Defendants contend there is no evidence that they knew or entertained serious doubts that the statement in question was false. They allege the affidavits and depositions indicate that the embassy official during the interview was seated at his desk and from time to time would remove an address card from his address file. He would then allegedly read to Howe the name, address and phone number listed on the card and, at times, comment about that individual. Although at first Howe insisted that the official read the words "homicidal tendencies" from the file card on plaintiff, it is now admitted that the card contained no such entry. Rather, he and his co-defendants urge that the official stated plaintiff had "homicidal tendencies" while reading other information from the card and that the mistaken belief that the words "homicidal tendencies" were contained on the card was reasonable and certainly does not evidence reckless disregard for the truth. Moreover, the official in his deposition and in a subsequent affidavit stated that, although his memory of the interview was sketchy, he recalled making the point that many supporters of the Provisional IRA were vicariously involved with the violence in Northern Ireland. He added further that it "would have been consistent with [his] belief" and is "quite likely" that he identified plaintiff as one of those so involved. The official noted that, while he had no clear recollection of the precise words used, it was "possible" that he used the words "homicidal tendencies" in reference to plaintiff. Finally, he agreed that Howe's notes on the interview, which contained the words "homicidal tendencies" in a paragraph on plaintiff, reflected the substance of what was said.

Plaintiff seeks to raise an issue of actual malice by attacking the credibility of both Howe and the embassy official. Plaintiff notes that during Howe's deposition, in response to a series of questions addressing what the embassy official had read to him from the file card, Howe stated that "My source said, 'It says here homicidal tendencies.' " [27] Not only does this statement flatly contradict the testimony of the embassy official, who insisted that the card contained no such comment, but, in light of this testimony, it also is now repudiated by Howe.

Similar inconsistencies can be found in the testimony of the embassy official. Although at his deposition the official stated that it was "possible" that he used the words "homicidal tendencies" to describe plaintiff, in an earlier letter to a priest in Brooklyn, New York, the official denied that such a statement had been made. Moreover, at least at the time of his deposition, the official's memory of his interview with Howe was so sketchy that his testimony that "possibly" he used the words "homicidal tendencies" is of little if any probative value. In sum, plaintiff raises serious factual questions concerning the credibility of Howe and the embassy official from which a reasonable jury could find with convincing clarity that Howe, despite his testimony to the contrary, published the allegedly libelous statement with serious doubt as to its truth, or indeed, that he fabricated the reported incident altogether. These disputed issues of material fact preclude the Court from granting summary judgment for defendant Howe on the ground that he lacked actual malice in publishing the relevant phrase.

■ Plaintiff also urges that defendants Trott and Doubleday published the statement in question with actual malice. Although plaintiff admits that neither of these two defendants was present at the interview of the embassy official or had direct knowledge of the facts on which the allegedly libelous statement was based, he contends that the truth of the accusation of homicidal tendencies was so improbable that it should have alerted these defendants

**27.** Howe deposition, p. 35.

that further verification was called for.[28] However, the truth of an accusation that a priest from Northern Ireland has "homicidal tendencies," particularly in light of the known violence in Northern Ireland, is no more improbable than, for example, the truth of a charge that a judge is "probably corrupt," which has been found insufficient to raise substantial reason for a publisher to question the accuracy of an article.[29]

Moreover, defendants Trott and Doubleday insist they had no reason to doubt the truth of the relevant statement. Trott's role in writing the Irish subchapter was confined to editing for clarity and style; she had nothing to do with its substance. Her liability thus may be assessed as if she were a publisher or editor. She asserts that she had "the utmost confidence in the integrity of her co-author."[30] Doubleday similarly asserts that its editors were familiar with and relied upon the reputations and experience of both Howe and Trott.[31] Howe had extensive experience as a foreign correspondent for five major newspapers and had seven published books to his credit. Trott had considerable experience with the inner workings of Washington politics and had been involved with several major publications. Moreover, Doubleday had its attorneys explain to the authors the law of libel and the type of substantiation they should gather. These same lawyers also reviewed the manuscript before publication and were not troubled by the statement at issue. At the time of publication, therefore, no question of the accuracy of Howe's "homicidal tendencies" statement had been raised.[32] That inaccuracies in Howe's report came to light after publication is irrelevant to the essentially fault-based determination of whether the report was published with actual malice.[33] Under these circumstances, Trott and Doubleday were entitled as a matter of law to rely on Howe's proven reportorial ability, and the motion for summary judgment as to them must be granted.[34]

■ Finally, defendants contend they are shielded from liability by the Second Circuit's neutral reportage privilege announced in *Edwards v. National Audubon Society*.[35] As outlined in the *Edwards* opinion, the privilege protects from liability for libel the accurate and disinterested reporting of serious charges against a public figure made by a responsible, prominent organization regardless of the validity of the charges.[36] The privilege was designed to promote "[t]he public interest in being fully informed about controversies that often rage around sensitive issues."[37] Defendants urge that since the Irish Embassy is a responsible, prominent organization, the charge launched was serious, it was reported accurately and disinterestedly, and plaintiff is a public figure, then defendants report of the charge must be privileged under that doctrine. This argument, however, misconstrues the scope of the *Edwards* privilege.

**28.** *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157–58, 87 S.Ct. 1975, 1992–93, 18 L.Ed.2d 1094 (1967); *Goldwater v. Ginzburg*, 414 F.2d 324, 339 (2d Cir. 1969), *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).

**29.** *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 381–83, 397 N.Y.S.2d 943, 951–52, 366 N.E.2d 1299, 1307–08 (1977).

**30.** Trott Aff. ¶ 4.

**31.** Drew Aff. ¶ 4.

**32.** *Cf. Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157–58, 87 S.Ct. 1975, 1992–93, 18 L.Ed.2d 1094 (1967).

**33.** *See* Note, *In Defense of Fault in Defamation Law*, 88 Yale L.J. 1735, 1742 (1979).

**34.** *See Washington Post Co. v. Keogh*, 365 F.2d 965, 972–73 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 958–61 (S.D.N.Y. 1976); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382–83, 397 N.Y.S.2d 943, 951–52, 366 N.E.2d 1299, 1307–08 (1977); *cf. Hotchner v. Castillo-Puche*, 551 F.2d 910, 913–14 (2d Cir. 1977).

**35.** 556 F.2d 113 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

**36.** *Id.* at 120.

**37.** *Id.*

In *Edwards*, the National Audubon Society in the preface to its annual bird count charged that certain scientists who had misused its bird 'count data to suggest that the insecticide DDT was not harmful to birds were "paid liars." Only after the Audubon Society had made these charges did a *New York Times* reporter contact the Society, solicit the names of the scientists referred to, and publish the contested story. Here, by contrast, the charges by the Irish Embassy official were solicited at the outset by Howe. Unlike the reporter in *Edwards*, however, who simply reported an autonomous news event, albeit with certain factual embellishments, Howe was engaged in purely investigative reporting. Unlike *Edwards*, no controversy raged around the libelous statement before the reporter entered the scene. Judge Friendly recently noted that, "[a]s would be natural in a case establishing a new principle, the *Edwards* opinion did not attempt precise definition of its contours. However, it did contain important suggestions that the privilege was limited in scope and required careful examination of the facts of each case." [38] Since there is no indication in the *Edwards* opinion that the neutral reportage privilege was meant to cover investigative reporting, and since including reports of such journalist-induced charges within the protection of the privilege is unnecessary for promoting the purpose of *Edwards*, the freer reporting of raging controversies, this Court is constrained to find the defendant-author here unprotected by the privilege.

Accordingly, the motion for summary judgment is denied as to defendant Howe and granted as to defendants Trott and Doubleday.

So ordered.

---

38. *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 68–69 (2d Cir. 1980).