SIMMONS FORD, INC. and Sebring-Vanguard, Inc., Plaintiffs,

v.

CONSUMERS UNION OF the UNITED STATES, INC., Defendant.

No. 80 Civ. 1901.

United States District Court,
S. D. New York.

June 23, 1981.

Eugene T. Field, P. C., Kalamazoo, Mich., Cormac McEnery, Brooklyn, N. Y., for plaintiffs; Samuel T. Field, Kalamazoo, Mich., of counsel.

Karpatkin, Pollet, Delibert & Beil, New York City, for defendant; Michael N. Pollet, Steven Delibert, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff Sebring-Vanguard, Inc., now bankrupt,[1] manufactured the "CitiCar," one of the two electrically powered automobiles generally available in the United States in 1975. Plaintiff Simmons Ford, Inc. was a retailer of the CitiCar. The CitiCar was introduced into the market after extensive advertising as an alternative to the internal combustion engine that could reduce exhaust emissions and save fossil fuels. Public interest in this alternative means of conveyance had been triggered by the 1973 Arab oil embargo.

Plaintiffs commenced this action against Consumers Union of the United States, Inc., publisher of the well-known monthly magazine *Consumer Reports*, which has a circulation of approximately two million and reports the results of defendant's not-for-profit consumer testing organization on the quality, characteristics and price of various consumer products.[2] The defendant, based upon allegations in plaintiffs' complaint, refers to plaintiffs' claim as an action for defamation controlled by the principles of *New York Times v. Sullivan*[3] and its progeny. Plaintiffs insist their action is one for disparagement of product. However, in end result, whatever label is applied does not affect the outcome of defendant's instant motion since plaintiffs concede that an essential element of a claim for disparagement of a product is that defendant published the article in question with actual

---

1. The trustee in bankruptcy is authorized to continue this action pursuant to an order of the United States District Court for the Southern District of Florida dated December 1, 1980.

2. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 508 F.Supp. 1249, 1252 (D.Mass.1981).

3. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

malice, that is, with knowledge of its falsity or with reckless disregard for its truth.[4]

Plaintiffs' claim is based on an article in the October 1975 issue of *Consumer Reports* entitled "Two Electric Cars," which was highly critical of the CitiCar and the other electric car on the market, the "Elcar." Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. At oral argument, upon questioning by the Court, plaintiffs declined an offered opportunity for discovery pending disposition of this motion and asserted that the motion was ripe for disposition on the affidavits and the statements filed pursuant to Local Rule 3(g). Because plaintiffs have failed to establish the existence of a genuine issue for trial as to whether the article was published with actual malice, defendant's motion must be granted. Plaintiffs' conclusory allegations are insufficient to raise a triable issue and to put the defendant to the burden and expense of a trial.

*THE ARTICLE*

The article "Two Electric Cars" detailed at length a variety of safety problems plaguing the CitiCar and Elcar, notably their flimsy construction and low maximum speed, both of which rendered the cars, in the opinion of the article's writers, unsafe for use on public highways also traveled by faster and heavier automobiles. The article in relevant part was based on a battery of tests conducted at defendant's Auto Test Division in Orange, Connecticut and performed on a CitiCar purchased at random through one of Sebring-Vanguard's distributors. Testing by defendant's automobile safety engineers included routine, day-to-day driving over local roads and formal testing at the Test Division to measure objectively such characteristics as speed, acceleration, braking, handling and similar matters. Defendant concluded the testing demonstrated that the CitiCar suffered from poor acceleration, low top speed, poor braking, poor handling, poor ride, poor comfort and generally negative performance. On the basis of the foregoing, Robert D. Knoll, Chief of the Division, with nearly thirty years' experience in automotive engineering, was of the opinion that the CitiCar was "an extremely dangerous and unsafe vehicle, wholly unsuited for transportation on the public highway, and raising a genuine threat of serious injury or death to any person foolhardy enough to drive one."[5] Accordingly, he urged that the car be rated "Not Acceptable."

In accordance with the usual Consumers Union practice for Auto Test Division projects, Knoll prepared a draft report, or "Report to Editorial," incorporating the Test Division's findings, which was submitted to defendant's editorial offices for revision and rewriting by a staff writer into the final article as published. Although the article detailed extensive faults with the CitiCar, some of which are enumerated above, the sole passage now challenged by plaintiffs as false is the following:

> Conventional passenger cars must conform to certain Federal safety standards. But to spur the development of low-emission vehicles, the Government has granted temporary exemptions from some of those standards to manufacturers of electric cars—with unfortunate results.

> Conventional cars must provide lifesaving protection to occupants in a 30-mph barrier crash, a 30-mph rollover, and a 20-mph side impact from another car. We believe any such crash would imperil

---

4. *See* Plaintiffs' Memorandum of Law in Opposition at 8–9 (citing Restatement (Second) of Torts § 623A). Since a manufacturer's interest in the reputation of its product is not nearly as significant as an individual's interest in his personal reputation and the public's interest in obtaining information about the quality and character of products is comparable to its interest in obtaining information about people, First Amendment considerations require application of the actual malice standard to product disparagement suits, at least when the plaintiff is a public figure. *Bose Corp. v. Consumers Union of U.S., Inc.,* 508 F.Supp. 1249, 1270–71 (D.Mass.1981).

5. Affidavit of Robert D. Knoll ¶ 31 (hereafter "Knoll Aff."). *See also* Affidavit of Carl F. Thelin ¶ 16 (hereafter "Thelin Aff.")

the lives of persons inside these tiny, fragile, plastic-bodied vehicles.[6]

Plaintiffs challenge the article to the extent it states that the CitiCar was unsafe for the particular reason that it failed to meet assertedly mandatory federal regulations requiring life-saving protection to occupants in a 30-mph barrier crash, a 30-mph rollover and a 20-mph side impact. While plaintiffs do not specifically claim that their vehicle could meet these tests,[7] they contend that the statement is false because the occupant crash protection mandatory requirements described in the article were not in existence as the article stated and consequently conventional cars were not required to comply with them. Furthermore, they contend that the statement is false insofar as it asserts that electric cars were temporarily exempted from this allegedly nonexistent mandatory regulation. Plaintiffs allege these falsehoods were made by defendant with actual malice.

This segment of the article, which is the core of plaintiffs' claim, indeed is not entirely accurate. The "certain Federal safety standards" mentioned in the article refer to a portion of Standard 208 of the Federal Motor Vehicle Safety Standards promulgated by the National Highway Traffic Safety Administration pursuant to 15 U.S.C. § 1391 *et seq.* Standard 208 specifies performance requirements for the protection of vehicle occupants in crashes. The occupant crash protection requirements enumerated in the article—protection in a 30-mph barrier crash, a 30-mph rollover and a 20-mph side impact—are the performance standards that must be met by a passive restraint system to be acceptable under this Standard. A passive restraint system, such as "airbags" that self-inflate on impact, protects occupants without any action on their part unlike, for example, seat belts, which require fastening by the occupant to be effective. Installation of a passive restraint system meeting these standards, however, is only one of several options for satisfying the performance requirements of Standard 208.[8] This Standard provides two alternative methods for satisfying its terms, both of which involve the installation of seat belts. While seat belts must meet specified performance standards of their own, they are not required to meet the three standards outlined in the article, which apply only to the passive restraint system option under Standard 208. Substantially all conventional automobiles at the time satisfied Standard 208, not by meeting the standards outlined in the article, but by installing seat belts. The falsehood contained in the article, therefore, is the implication that the standards outlined were mandatory requirements of Standard 208 when in fact they were requirements of only one option for satisfying the Standard.

The remainder of these two paragraphs, however, is accurate. Sebring-Vanguard had applied for and received an exemption from Standard 208 from January 1974 to January 1975 because it was "uncertain whether [the CitiCar's] frame could withstand the forces required by Standard No. 208 for upper torso restraints," an element of the seat belt requirements.[9] Although there is some dispute over whether the Citi-

---

**6.** Knoll Aff. Exh. A (*Consumer Reports*, Oct. 1975, p. 596).

**7.** Plaintiffs' strongest claim in this regard is that, to the best of their knowledge, defendant never performed any tests to determine whether the CitiCar could meet these standards. Plaintiffs' Memorandum in Opposition at 13–14. However, it is apparent that, to defendant's employees who were experts in the field of automotive safety, the inability of the CitiCar to meet these tests was evident upon mere casual observation. Indeed, Knoll, upon his initial inspection of the vehicle, stated that he "quickly came to have serious questions as to the probable safety and crashworthiness of the CitiCar. It was obviously a very small vehicle, and its body shell was manufactured entirely of plastic, over a light aluminum frame. There at once arose doubts in my mind as to the vehicle's ability to withstand any severe impact, in collision with another automobile or any substantial stationary object, such as a wall or tree." Knoll Aff. ¶ 25.

**8.** *See* 40 Fed.Reg. 33977 (Aug. 8, 1975) (extending this option through Aug. 31, 1976).

**9.** 39 Fed.Reg. 3710 (Jan. 29, 1974) (granting exemption); 38 Fed.Reg. 31556 (Nov. 15, 1973) (application for exemption).

Car tested by defendant was manufactured during this exemption period, or after its expiration, plaintiffs do not dispute the defendant's statement that the car tested by it contained nonconforming seat belts which could not meet federal safety standards because they did not incorporate the automatic retractors required by regulation.

Defendant admits the inaccuracy of its report of the precise federal safety standard requirement from which the CitiCar was exempted. It argues, however, that the mistake was reasonable on two grounds. First, defendant notes that Standard 208 is highly confusing, being replete with cross-references and other such statutory twists. Second, defendant points out that many automobiles in effect substantially met the passive restraint requirements of Standard 208 in order to pass the fuel system integrity requirements of Standard 301–75. Standard 301–75 requires automobiles to be constructed so that no more than extremely limited fuel is discharged upon various types of impact. Because these types of impact are substantially similar to those described in the passive restraint tests of Standard 208, defendant claims it mistakenly confused or "telescope[d]" the two standards.[10] The CitiCar obviously was not subject to the fuel system integrity requirement because it was electrically powered and carried no fuel. Plaintiffs do not dispute that the fuel system integrity requirement has much the same effect as if the passive restraint requirements of Standard 208 were mandatory.

One year later, due largely to comments from Sebring-Vanguard with respect to the defendant's numerous criticisms of the Citi-Car in the October 1975 issue and its claims that more recent models were substantially improved, the defendant conducted further tests. Again it purchased a CitiCar from one of Sebring-Vanguard's dealers. Its automotive safety engineers conducted a second battery of tests on this later model. *Consumer Reports* then printed a second article on the CitiCar based on the results of these new tests. While certain minor improvements were noted in the newer car, several safety defects, including a severely defective braking system, were found, causing defendant to reaffirm its prior conclusion that the CitiCar was "Not Acceptable." *Consumer Reports* did, however, print a "Correction" of its statement concerning federal safety standards. The "Correction" noted:

> It was incorrect for us to state that current safety standards require protection under the test conditions described and that the Government had granted exemptions from such protection to manufacturers of electric cars. That protection is required only in cars equipped with air bags or some other passive restraint systems. In other cars, it's optional.
>
> The CitiCar had been exempted from a number of other safety-related standards. But CU did not judge the CitiCar Not Acceptable because of the exemptions it had been granted. It was judged Not Acceptable on its demerits alone. We still believe a crash represents a much greater hazard to occupants of this tiny electric car than to occupants of conventional automobiles.[11]

*ACTUAL MALICE*

[1] Plaintiffs contend that defendant's actions in publishing the false statement in question evidence actual malice. To demonstrate actual malice, plaintiffs must show with "convincing clarity" that defendant, in publishing the article in question, "in fact entertained serious doubts as to the truth of [its] publication."[12] This standard "requires a clear and convincing showing,

**10.** Thelin Aff. ¶ 34.

**11.** Knoll Aff. Exh. B (*Consumer Reports*, Oct. 1976, p. 573).

**12.** *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *see Bose Corp. v. Consumers Union of U.S., Inc.*, 508 F.Supp. 1249, 1276 (D.Mass. 1981) (applying this standard to product disparagement suit).

which may be by circumstantial evidence, of defendant's actual state of mind—either subjective awareness of probable falsity or actual intent to publish falsely."[13] The current rule in the Second Circuit is that summary judgment motions addressing the issue of whether a publication was made with actual malice are to be treated no differently from traditional summary judgment motions. The Court thus must disregard the chilling effect on expression protected by the First Amendment and simply examine whether, accepting plaintiffs' version of contested facts, "a reasonable jury *could* find [actual] malice with convincing clarity."[14]

In the case at hand, the issue of actual malice is far simpler than either party makes it. While much time is spent discussing the elaborate testing procedure employed at Orange, Connecticut, the results of these tests as applied to the CitiCar are not seriously disputed. In response to a specific claim in defendant's statement pursuant to Local Rule 3(g) that the CitiCar did not meet the various safety standards at issue, plaintiffs do not specifically deny the charge, but contend only in general terms that "the CitiCar was safe and practicable for use upon the public highway in the manner for which it was designed." Plaintiffs' failure to rebut defendant's specific claim regarding the safety standards may be deemed an admission that the CitiCar could not meet them.[15] The sole issue before the Court on the question of actual malice, therefore, is whether defendant's mistaken interpretation of the Federal Motor Vehicle Safety Standards demonstrates the required knowing or reckless disregard for the truth. The conclusion is compelled that no reasonable jury could find with convincing clarity on the facts here presented that defendant acted with actual malice.[16]

In preparing the paragraphs in question, Knoll consulted with Carl F. Thelin, an Automobile Safety Engineer employed by defendant, concerning the requirements of the Federal Motor Vehicle Safety Standards. Thelin was the employee of defendant most expert in the area of automobile safety standards. Both Knoll and Thelin swear that, at the time the article was written and reviewed, they regarded the relevant statements to be a correct and accurate summary of the facts concerning the federal safety standards and the CitiCar's exemption from them. The article was also reviewed by several other of defendant's employees, none of whom raised any question as to the accuracy of these two paragraphs. All these individuals were highly experienced in testing automobile safety, and it was thus entirely reasonable that defendant rely on their expertise in stating federal safety requirements.[17]

Although professions of an author's belief do not necessarily exonerate defendant, the plaintiffs bear the burden of responding to these sworn averments by introducing facts from which the existence of actual malice may reasonably be inferred.[18] Plaintiffs' repeated conclusory and conjectural statements, such as that "defendant's employees, including Mr. Knoll and Mr. Thelin, had reason to believe that the statements in said article were incorrect and inaccurate, and further they acted in reckless disregard of the truth," and other statements of similar import, are utterly

**13.** *Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932, 940 (2d Cir. 1980).

**14.** *Id.; see McManus v. Doubleday & Co.*, 513 F.Supp. 1383, at 1388 (S.D.N.Y.1981).

**15.** *See* ¶¶ 25–32.

**16.** *Cf. Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932, 941 (2d Cir. 1980).

**17.** Plaintiffs allude to the absence of an affidavit from a "staff member of the Consumers Union Library," who is reported to have checked the accuracy of the article in question, as raising a factual issue of defendant's actual malice. However, in light of the undisputed expertise of Knoll and Thelin, the omission cannot reasonably raise such an issue.

**18.** *Bose Corp. v. Consumers Union of U.S., Inc.*, 84 F.R.D. 682, 685 (D.Mass.1980); *Reliance Ins. Co. v. Barron's*, 442 F.Supp. 1341, 1350 (S.D.N.Y.1977).

without the slightest evidential support and do not raise a factual issue as to actual malice. Plaintiffs at best are expressing a hope of what they would attempt to establish through cross-examination of defendant's witnesses upon a trial. Plaintiffs' failure to meet the sworn statements of defendant on this motion is emphasized by the opportunity specifically offered to them by the Court and declined by them to depose the defendant or any of its employees familiar with matters at issue. As the Second Circuit recently noted in addressing a claim of slander of title, a "plaintiff does not become entitled to a jury trial simply by asserting a cause of action in which the defendant's state of mind is a material element. Some facts must be asserted to support the claim that the state of mind existed."[19]

Plaintiffs contend that Thelin, in his affidavit, effectively admits that the safety standards in question were confusing and ambiguous to him, and thus it was reckless of him to publish statements concerning these standards. An analysis of Thelin's affidavit, however, reveals that no such admission was made. Although Thelin acknowledges that the safety standards contain "repeated, recursive cross-references," are "closely interrelated," and incorporate "similar requirements for various purposes," he concludes only that "[i]t can . . . become very easy to confuse or telescope two or more standards—especially [Standard] 208, the crashworthiness standard, and [Standard] 301–75, the fuel system integrity standard, which incorporate[ ] similar requirements in slightly different ways, for slightly different purposes." The affi-

davit was made after the publication and with the benefit of hindsight that the statement concerning the safety standards had been erroneous. At no point does Thelin state that he was, or even should have been, confused at the time of publication. Indeed, he specifically affirms the contrary: "If there was a misstatement, I had no idea whatever that it was one at the time it was written, at the time I reviewed it, or at the time it appeared in the magazine."[20] Read as a whole, therefore, the affidavit could not reasonably be read to evidence the subjective awareness of probable falsity required to establish actual malice.[21]

Plaintiffs also seek to attribute a "lack of objectivity" to defendant as evidence of recklessness based on an allegedly unique testing procedure that was applied to the CitiCar. Plaintiffs specifically note that defendant did not give the CitiCar the standard break-in period permitted other cars, which allegedly would have improved its performance. During the break-in period, a car is used by defendant's engineers and other employees for ordinary, personal, over-the-road transportation for an interval of about two thousand miles for conventional cars.[22] The CitiCar was driven only about six hundred miles during its break-in period. Defendant accounts for this shorter break-in period by pointing to the CitiCar's limited range and speed and, after a time, defendant's employees' reluctance to drive the car on public highways out of fear for their personal safety.[23]

Plaintiffs also allude to an "irregularity" in that the CitiCar was not later brought to a test track at Lime Rock, Connecticut, as

19. *Markowitz v. Republic National Bank of New York*, 651 F.2d 825, at 828 (2d Cir. 1981) (citations omitted); *see Dyer v. MacDougall*, 201 F.2d 265, 268–69 (2d Cir. 1952) (L. Hand, J.); *Morgan v. Sylvester*, 125 F.Supp. 380, 389–90 (S.D.N.Y.1954), *aff'd per curiam*, 220 F.2d 758 (2d Cir.), *cert. denied*, 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955).

20. Thelin Aff. ¶ 36.

21. *Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932, 940 (2d Cir. 1980); *see St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Bose Corp. v. Consumers Union of U.S., Inc.*, 84 F.R.D. 682, 685 (D.Mass.1980); *Meeropol v. Nizer*, 381 F.Supp. 29, 32 (S.D.N.Y.1974), *aff'd in part & rev'd in part*, 560 F.2d 1061 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); Note, *In Defense of Fault in Defamation Law*, Yale L.J. 1735, 1742 (1979).

22. Thelin Aff. ¶ 17.

23. Knoll Aff. ¶ 28.

most cars are. Defendant adequately explains this deviation, however, since first, because the CitiCar's top speed was only 30 mph, a racing track such as Lime Rock was unnecessary to perform the tests, which instead were executed in the Orange parking lot; second, because of the manifest safety problems, its employees sought to avoid the risk of driving the car to Lime Rock; and third, the car had insufficient range on a single charge of its batteries to cover the roughly 70 miles to Lime Rock.[24]

Similarly, plaintiffs contest the fairness of comparing the CitiCar directly to the performance and safety of gasoline-powered automobiles, without regard to the alleged fact that the CitiCar was designed for an altogether different purpose. Plaintiffs refer to the intended use of the CitiCar for low-speed, in-town driving. However, given the contemporary reality of highways dominated by larger, gasoline-powered automobiles, it could not be found unreasonable for defendant to evaluate the CitiCar's safety under these conditions in comparison with other, existing transportation options. As defendant notes, while the argument that low-speed vehicles such as the CitiCar need not provide the same level of occupant protection as a conventional automobile is at first "beguiling," it is "wholly fallacious" because the CitiCar, like any auto, must share the town and city streets and highways with other vehicles, the vast majority of which travel at high speeds and weigh one to two tons or more. In a collision with such a vehicle, a CitiCar's occupants would be in the "greatest of peril."[25] While the CitiCar might well be safe on highways used exclusively by electric cars, a contrary conclusion is not unreasonable under contemporary driving conditions. For example, many of defendant's employees expressed "the fear of being struck from behind on hills, as the exceedingly slow-moving CitiCar had the appearance in the dark of a normal automobile, and an approaching driver would often be unable to realize how slowly the auto was moving until he was almost upon it." Employees cited a number of near-miss incidents of precisely this nature.[26]

In sum, none of these aspects of defendant's testing and reporting procedures reasonably could support a finding that defendant published the article on CitiCar with actual malice. Summary judgment must therefore be granted for defendant.

*TIME, INC. v. PAPE*

The reasonableness of this error and the corresponding lack of actual malice is highlighted by the case of *Time, Inc. v. Pape*.[27] It may be acknowledged that the regulations contained in Standard 208 hardly qualify as a model of clarity. Indeed, it is not without significance that the attorney for the National Highway Traffic Safety Administration, who presumably possessed special expertise with respect to the regulations and who stated that those referred to "are only part of *proposed* amendments to [Standard] 208,"[28] himself is charged by defendant with not understanding their application at the time the article was published.[29] A reading of Standard 208 readily demonstrates its complexity, and the reasonableness of mistakenly interpreting the passive restraint requirements as mandatory rather than optional, particularly since it is undisputed that most fuel-powered automobiles substantially conform to the passive restraint requirements by complying with other regulations on the maintenance of fuel system integrity.[30]

In *Time, Inc. v. Pape*, the Supreme Court found actual malice lacking when a reporter

---

24. *Id.* ¶ 29.

25. Thelin Aff. ¶ 17.

26. Knoll Aff. ¶ 28.

27. 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

28. Knoll Aff. Exh. L (emphasis added).

29. Knoll Aff. ¶¶ 47–48.

30. Indeed, Sebring-Vanguard, in its extended correspondence with defendant protesting the article's treatment of the CitiCar, did not even mention the article's inaccurate report of the federal safety standards until nearly ten months after publication. Knoll Aff. ¶¶ 39–46.

knowingly omitted the word "alleged" from his account of a Commission report describing a civil rights violation committed by Pape. The finding was based on Time, Inc.'s defense that although its reporter knowingly omitted the word, he did so because he thought the Commission believed Pape actually had committed the violation and thus that the account was true. The Supreme Court held that the knowing "omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably a misconception, was not enough to create a jury issue of 'malice' under *New York Times*."[31] The instant dispute presents an even more compelling case for finding an absence of actual malice than do the facts of *Time, Inc. v. Pape*. While in both cases the report was substantially correct, the instant "arguable misconception" came about unintentionally rather than knowingly. Both Knoll and Thelin, in their affidavits, stated that at the time of publication they fully believed the article to be entirely accurate as written.[32]

## "LIBEL–PROOF" DEFENSE

Moreover, summary judgment must be granted on the independent ground that plaintiffs fail to overcome the doctrine enunciated by the Second Circuit in *Cardillo v. Doubleday & Company*.[33] *Cardillo* is one of a series of cases in which a libel claim by a plaintiff with an extensive criminal record was dismissed when the allegedly false accusation launched against him is the commission of yet another crime.[34] In *Cardillo*, the court held that the appellant, a habitual criminal, was "libel-proof" for the purpose of that case. The court reasoned that since the truth of appellant's illicit past was as

damaging as the alleged falsehoods, he was unlikely to recover anything other than nominal damages. His limited reputational interest thus did not warrant risking the First Amendment interests involved, and accordingly the suit was dismissed.

Subsequently, in *Buckley v. Littell*,[35] the Second Circuit cautioned against extending the *Cardillo* doctrine beyond its "basic factual context."[36] The court rejected the argument that the plaintiff was libel-proof simply because he had access to channels of rebuttal, noting that "his reputation, however capable he may be of answering false and defamatory attack with the communications resources at his command, is nevertheless one that could suffer under the onus of defamation."[37] Here, by contrast, the portion of the article challenged by plaintiffs, could not harm their reputations in any way beyond the harm already caused by the remainder of the article. It may be acknowledged the reputation of the CitiCar was damaged by defendant's finding that CitiCar was "Not Acceptable." However, the blunt fact is that, in light of defendant's extensive and detailed testing procedures, if the article had made no reference to federal safety standards, or to the CitiCar's exemptions from them, the opinions expressed therein upon which the defendant concluded the car was "Not Acceptable" would not give rise to any actionable claim in plaintiffs' favor. Given the abysmal performance and safety evaluations detailed in the article, plaintiffs could not expect to gain more than nominal damages based on the addition to the article of the misstatement relating to federal safety standards. As defendant notes, "at the time the article was prepared, there was ample basis in fact to reach an opinion that the CitiCar was unsafe and 'Not Acceptable,' even apart from the specific safety standards in ques-

---

31. 401 U.S. at 290, 91 S.Ct. at 639.

32. Knoll Aff. ¶ 33; Thelin Aff. ¶ 36.

33. 518 F.2d 638 (2d Cir. 1975).

34. *See, e. g., Logan v. District of Columbia*, 447 F.Supp. 1328 (D.D.C.1978); *Ray v. Time, Inc.*, 452 F.Supp. 618 (W.D.Tenn.1976), *aff'd*, 582 F.2d 1280 (6th Cir. 1978); *Urbano v. Sondern*, 41 F.R.D. 355, 357 (D.Conn.), *aff'd*, 370 F.2d 13

(2d Cir. 1966), *cert. denied*, 386 U.S. 1034, 87 S.Ct. 1485, 18 L.Ed.2d 596 (1967); *Mattheis v. Hoyt*, 136 F.Supp. 119, 124 (S.D.Mich.1955).

35. 539 F.2d 882 (2d Cir. 1976).

36. *Id.* at 888–89.

37. *Id.* at 889.

tion." [38] Given this background, plaintiffs' reputational interest in avoiding further adverse comment regarding the safety and performance of CitiCar is minimal when compared with the First Amendment interests at stake. Summary judgment thus must be granted on this ground as well.

*VICARIOUS LOSS*

Finally, summary judgment is granted against Simmons Ford for the further reason that there was no reference to it directly or indirectly in the article and the only losses sustained by it were the lost sales of a retailer. A long line of cases holds that First Amendment considerations preclude a plaintiff from recovering based on losses sustained by virtue of the defamation of another.[39] The same First Amendment considerations preclude such vicarious liability by anyone other than the manufacturer in a product disparagement suit. In attempting to refute this conclusion, plaintiff relies unsuccessfully on *Advance Music Corp. v. American Tobacco Co.,*[40] but that case involved the manufacturer of the records at issue, not a retailer.

Accordingly, defendant's motion for summary judgment is granted.

So ordered.

---

**38.** Knoll Aff. ¶ 37.

**39.** *See, e. g., Meeropol v. Nizer,* 381 F.Supp. 29, 34–35 (S.D.N.Y.1974), *aff'd,* 560 F.2d 1061 (2d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct.

727, 54 L.Ed.2d 756 (1978); *Fowler v. Curtis Pub. Co.,* 78 F.Supp. 303, 304 (D.D.C.1948), *aff'd,* 182 F.2d 377 (D.C.Cir.1950).

**40.** 296 N.Y. 79, 70 N.E.2d 401 (1946).