**Ariel SHARON, Plaintiff,**

v.

**TIME INC., Defendant.**

**No. 83 Civ. 4660 (ADS).**

United States District Court, S.D. New York.

Dec. 9, 1983.

Shea & Gould, New York City, for plaintiff; Milton S. Gould, Bernard D. Fischman, Arnold Forster, Richard M. Goldstein, Andrea B. Feller, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant; Robert S. Rifkind, Stuart W. Gold, Louis M. Solomon, Valerie E. Caproni, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

The complaint in this case, brought by General Ariel Sharon, former Minister of Defense of the State of Israel, charges Time, Inc., with libel for a statement published in *Time*, its mass-circulation weekly. Sharon claims the statement accuses him of knowingly permitting or encouraging the murder of Palestinian refugees at the Sabra and Shatilla camps in West Beirut, Lebanon. Time has moved to dismiss the complaint, arguing that the allegedly objectionable statement is not libelous, that Sharon is libel proof on the issue of his involvement in the Sabra and Shatilla mas-

sacre, and that the alleged libel is one that requires Sharon to plead special damages, which he has failed to do.

The statement of which plaintiff complains was made in the course of an article published in the issue of *Time* dated February 21, 1983, entitled "The Verdict is Guilty." The article describes the findings and recommendations of the Kahan Commission, appointed by the State of Israel to investigate the murders of Palestinians at Sabra and Shatilla.[1] It contains pictures of the victims and chief protagonists, some background materials, and an analysis of world reaction. It describes the Kahan Report as "a stinging indictment of Defense Minister Ariel Sharon and several military officials." Article at 26, *reproduced as* Appendix 2, Complaint. It recites that the Commission "asserted flatly" that the atrocities at the camps were committed by Phalangist forces, not Israelis, but that the Commission also found that Sharon and others bore " 'indirect' responsibility" because the decision to permit the Phalangists to enter the camps " 'was taken without consideration of the danger ... that the Phalangists would commit massacres and pogroms against the inhabitants.' " Article at 26, 28 (quoting Report at 12, 13).

The article mentions Sharon several times. First, in describing the events immediately before the massacre, the article states that on September 15, the day after the assassination of Bashir Gemayel, the Phalangists' military leader and Prime Minister-elect of Lebanon, "Sharon arrived in Beirut, conferred with his commanders and paid a condolence call on the Gemayel family." *Id.* at 28. Then, after describing the Commission's criticisms of Prime Minister Begin and Foreign Minister Shamir, the article recounts what it terms the Commission's "strongest condemnation":

For Sharon, the commission reserved its strongest condemnation, declaring: "It was the duty of the Defense Minister to take into account all the reasonable considerations for and against having the Phalangists enter the camps, and not to disregard entirely the serious consideration mitigating against such an action, namely that the Phalangists were liable to commit atrocities and that it was necessary to forestall this possibility as a humanitarian obligation and also to prevent the political damage it would entail. From the Defense Minister himself, we know that this consideration did not concern him in the least." It should have, concluded the report: "In our view, the Defense Minister made a grave mistake when he ignored the danger of acts of revenge and bloodshed by the Phalangists against the population in the refugee camps. These blunders constitute nonfulfillment of a duty with which [he] was charged." In consequence, Sharon should "draw the appropriate personal conclusions," i.e., resign or be fired by the Prime Minister.

*Id.* at 29 (quoting Report at 13, 22).

After reviewing the Commission's findings on the responsibility of other, senior military officers, the article continues with the paragraph that contains the only material cited by plaintiff as libelous:

One section of the report, known as Appendix B, was not published at all, mainly for security reasons. That section contains the names of several intelligence agents referred to elsewhere in the report. TIME has learned that it also contains further details about Sharon's visit to the Gemayel family on the day after Bashir Gemayel's assassination. Sharon reportedly told the Gemayels that the Israeli army would be moving into West Beirut and that he expect-

---

1. The Commission of Inquiry into the Events at the Refugee Camps in Beirut: 1983, Final Report (hereinafter "Report"), *reprinted in* The Jerusalem Post, Feb. 9, 1983, at 1–22, *reproduced as* Appendix 2, Defendant's Memorandum in Support of Motion to Dismiss. The Commission was appointed pursuant to a resolution of the Israeli Cabinet, adopted on September 28, 1982, and consisted of its chairman Yitzhak Kahan, President of the Supreme Court; Aharon Barak, Justice of the Supreme Court; and Yona Efrat, Major General (Res.), Israel Defense Forces (hereinafter "IDF").

ed the Christian forces to go into the Palestinian refugee camps. Sharon also reportedly discussed with the Gemayels the need for the Phalangists to take revenge for the assassination of Bashir, but the details of the conversation are not known.

*Id.*

## I. *Defamatory Meaning*

[1, 2] Time seeks dismissal, first, on the ground that the allegedly libelous statement cannot fairly and reasonably be construed to defame Sharon. The controlling standard is whether the offending words are "reasonably susceptible of a defamatory connotation" when read in the context of the article in which they appear, *James v. Gannett Co.*, 40 N.Y.2d 415, 419, 386 N.Y. S.2d 871, 874, 353 N.E.2d 834, 837 (1976), and with careful attention to "the particular phraseology used in the purported[ly] libelous statement," *Tracy v. Newsday*, 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 4, 155 N.E.2d 853, 855 (1959). The question is one of law, which the court must resolve by means of a " 'fair,' not a 'broad' reading." *Drug Research Corp. v. Curtis Publishing Co.*, 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 36, 166 N.E.2d 319, 321 (1960). The court may not, however, interfere with the jury's role by treating as nondefamatory a statement that a reasonable juror may fairly read in context as defamatory. *Mencher v. Chesley*, 297 N.Y. 94, 102, 75 N.E.2d 257, 260 (1947).

▮ The language on which the complaint focuses reads: "Sharon also reportedly discussed with the Gemayels the need for the Phalangists to take revenge for the assassination of Bashir, but the details of the conversation are not known." Time argues that a discussion of the need for revenge, without more, could not expose Sharon to hatred, contempt, or aversion, or harm him in his profession. Yet, Time recognizes that the statement must be read in context. Sharon contends that in light of the entire article the challenged statement may reasonably be read to suggest that he encouraged the Phalangists to

perpetrate bloodshed. Thus, Sharon alleges:

> The foregoing matter is false and defamatory in that it states that plaintiff discussed with the Gemayels the need for the Phalangists to take revenge against the West Beirut Palestinians and that plaintiff encouraged the Phalangists to perpetrate bloodshed among them. Plaintiff did not make any such statement nor did he participate in any such discussions as stated in the publication.

Complaint ¶ 7. Furthermore, Sharon claims that the article is also defamatory in that it "falsely attributes to the Commission a finding or determination that plaintiff in fact made such statements or participated in such discussions." *Id.* ¶ 8. Sharon alleges on information and belief that the secret appendix to the report "does not contain any such finding or determination, nor does it describe or contain any such statements or discussions allegedly made or engaged in by plaintiff." *Id.*

Time contends that these libelous interpretations are precluded by the thrust of the article, which reported the Commission's finding that Sharon had "disregarded entirely" and "ignored" the risk of Phalangist atrocities, because "Sharon could not both have disregarded the risk of the Phalangists' taking revenge and have been a provocateur of that revenge." Defendant's Memorandum at 13. Time's logic is unassailable, but inapposite. Unlike the article at issue in *James*, on which Time relies, the contents of the article here do not refute any allegedly defamatory suggestion. *See* 40 N.Y.2d at 420–21, 386 N.Y. S.2d at 875, 353 N.E.2d at 838. Time reported that it had "learned" the information conveyed by the purportedly libelous statement, and that the information had appeared in an appendix kept secret by the Commission for "security reasons." A reasonable reader could therefore construe the story to suggest that the Commission had actually reached a very different conclusion about Sharon's involvement in the massacre than it had publicly announced. Time cannot rely on its report of the Commission's public findings to refute the sug-

gestion of a coverup raised by the article itself.

Time also argues that plaintiff's reading is based on "layers of inference and assumption" beyond the plain language and meaning of the allegedly libelous sentence. It contends that, in order to reach the conclusion that Sharon encouraged the Phalangists to take revenge, a reader would be required to interpret the challenged statement to mean (1) that in discussing the need for revenge Sharon "took a position that acknowledged the reality of such a need;" (2) that he "acquiesced in or sanctioned action based" on the need; (3) that the "revenge" discussed was not political or conventional military action "but rather was to take the form of bloody mayhem;" and (4) that Sharon "affirmatively 'encouraged' or 'instigated' the bloodletting." Defendant's Memorandum at 16–17. Further, Time points out that the challenged sentence includes the qualification that "the details of the conversation are not known." *Id.* at 17 (quoting Article at 29). Time contends "the reasonable reader would not make those inferences or assumptions." *Id.*

These inferences and assumptions are reasonable, however, when the allegedly libelous statement is read in context, and with regard to its specific words. The article states that Sharon "discussed," not merely listened to statements concerning, "the need for the Phalangists to take revenge for the assassination of Bashir." The statement can be read to indicate that Sharon acknowledged such a need because it uses the words "the need," and not other forms of expression such as "the felt need" or "the Phalangists' need," or "the claimed need," and because the sentence immediately follows the statement that "Sharon reportedly told the Gemayels that ... he expected the Christian forces to go into the Palestinian refugee camps." Furthermore, the Commission noted that the Phalangists and Palestinians had repeatedly taken revenge on each other during the civil war, and the article reports the finding that a real danger existed of " 'acts of revenge and bloodshed by the Phalangists against

the population in the refugee camps.' " Article at 29 (quoting Report at 15). Indeed, the Commission's finding of fault against Sharon rested precisely on his refusal to acknowledge that the Phalangists must have felt a need for revenge after Bashir's death; it believed that any informed observer should have perceived this danger. That the "revenge" discussed might "take the form of bloody mayhem," rather than "political or conventional military action," is likewise a reasonable conclusion from the article, which reports the Commission finding "that the Phalangists were liable to commit atrocities." *Id.* (quoting Report at 15). Revenge among the competing groups in the Lebanese civil war typically took the form of bloody mayhem.

The further inferences purportedly required to reach a defamatory meaning— *i.e.,* that Sharon condoned a course of action for revenge, and that he promoted the bloodshed—are separate conclusions, either of which would have justified a charge of responsibility against Sharon far more serious than the Commission's public finding that he had disregarded the danger of revenge. In context, the statement that during a visit on the day after Bashir's assassination Sharon told the Gemayel family that he "expected" the Phalangists to enter the camps, coupled with the statement that he also "discussed the need" to avenge Bashir's death, could suggest to a reasonable reader that Sharon had at least condoned the massacre.

The article's claim that these findings were contained in a secret appendix to the Commission report enhances the reasonableness of a defamatory interpretation. A reader of the article would not readily conclude that the Commission had hidden from public view evidence favorable to Sharon, such as might support Time's suggestion that the reported discussion with the Gemayels could have been one in which Sharon had recommended *against* revenge. A reader would more reasonably reach the conclusion that in the secret appendix the Commission had withheld additional materi-

al adverse to Sharon, possibly on the rationale that Sharon had already been openly condemned and that full exposure would unnecessarily endanger Israel's political interests and moral standing. The article relates that nations have seldom indulged in self-criticism even to the extent of the Commission's public report, so a reasonable reader would hardly be surprised to find the same article suggesting that the Commission—having gone to unprecedented lengths—suppressed the full truth.

Time's argument also improperly assumes that Sharon's sole allegation of libel is the suggestion that he approved or instigated the massacre. Sharon also alleges, however, that in context the mere statement that he discussed the need for revenge prior to sending the Phalangists into the camps is libelous. Sharon's defense before the Commission was that he never considered a slaughter at the camps a real possibility, and therefore was unconcerned about preventing one. If he had in fact discussed the need for revenge in anticipation of sending the Phalangists into the camps, then he must have lied to the Commission when he asserted that he believed a bloody revenge so unlikely as to dismiss its consideration. To suggest so clearly that a Minister of Defense lied under oath, in an investigation of his conduct, is libelous. *See, e.g., November v. Time, Inc.,* 13 N.Y.2d 175, 179, 244 N.Y.S.2d 309, 312, 194 N.E.2d 126, 128–129 (1963) (defamatory to suggest that attorney sought influence with his championship boxer client "by methods inconsistent with his professional obligations"); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 379–82, 397 N.Y.S.2d 943, 949–51, 366 N.E.2d 1299, 1304–1305, 1307, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977) (defamatory to call judge "probably corrupt"); *Buckley v. Littell,* 539 F.2d 882, 896–97 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) (defamatory to call journalist a libeler even in context of attack on political views). Sharon contends that to suggest of a soldier and statesman that he so much as sat down with murderers and discussed their need for revenge without stopping them or protesting openly and vigorously is to degrade him in his profession. *See Mencher,* 297 N.Y. at 100, 75 N.E.2d at 259; *Bennet v. Commercial Advertiser Assoc.,* 230 N.Y. 125, 131, 129 N.E. 343 (1920).

Sharon's complaint also alleges that the article libeled him by falsely stating that the Commission had secretly found that he had discussed the need for revenge with the Gemayels before the massacre. Complaint, ¶ 8. The claim that the Commission actually made such a finding could lead a reasonable reader to conclude, not only that Sharon had lied in his defense, but also that the Commission, a highly respected quasi-judicial body, had found that he had done so.

The allegedly libelous statements in this case appear in an article that comments on important political events. Moreover, plaintiff is a public figure. His views and acts must remain open to a wide range of commentary and criticism, protected from even the slightest degree of regulation. As Judge Oakes has observed, "[t]he law of defamation has in effect been rewritten in the light of the constitutional imperatives". *Buckley,* 539 F.2d at 888. Because "[u]nder the First Amendment there is no such thing as a false idea," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), commentary in the form of opinion cannot defame. "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact," for they do nothing to advance "society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Id.* at 339–40, 94 S.Ct. at 3007 (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721–722, 11 L.Ed.2d 686 (1964)). The line between fact and opinion is imprecise, but the present case raises no difficulties on this score. The alleged libel here is a statement of fact, insofar as it states that in a secret appendix the Commission found that Sharon had met and discussed with the

**1168**

Gemayel family the need to revenge Bashir's assassination. It could reasonably be read to attack Sharon by alleging specific misdeeds. *Compare Rinaldi,* 397 N.Y. S.2d at 950–51, 366 N.E.2d at 1306–1307 (opinion as to judge's competence protected), *with id.* at 951, 366 N.E.2d at 1307 (statement that judge is "probably corrupt" unprotected, because suggestive of illegal actions).

## II. *The "Libel Proof" Defense*

■ Time contends that Sharon is libel proof as a matter of law. It argues that the alleged libels could do plaintiff's reputation so little incremental harm in the context of the other, unchallenged statements about him that the suit should be dismissed.

In *Cardillo v. Doubleday & Co.,* 518 F.2d 638, 639–40 (2d Cir.1975), the Second Circuit clearly enunciated the libel-proof principle. There the plaintiff complained of a book which purported to describe his participation in various crimes. The court dismissed as a matter of law, finding the plaintiff "unlikely by virtue of his life as a habitual criminal to be able to recover anything other than nominal damages." *Id.* at 639. It pointed out, moreover, that first-amendment interests support the libel-proof defense, in that it protects disseminators of news and views on public issues against burdensome litigation commenced by plaintiffs having no likelihood of significant recovery. *Id.* 639–40; *see also Wynberg v. National Enquirer, Inc.,* 564 F.Supp. 924, 927–28 (C.D.Cal.1982).

The libel-proof defense has also been applied in the noncriminal context. In *Simmons Ford, Inc. v. Consumers Union, Inc.,* 516 F.Supp. 742, 750–51 (S.D.N.Y. 1981), Judge Weinfeld dismissed a libel claim by the manufacturer of an electric car, who complained of a statement that the car had failed to meet federal safety standards. While such a statement might normally be libelous, the article contained several other devastating attacks on the safety of the car, none of which plaintiffs had challenged. Judge Weinfeld observed that "plaintiffs could not expect to gain more than nominal damages based on the addition to the article of the [allegedly actionable] misstatement." Finding "plaintiffs' reputational interest in avoiding further adverse comment ... minimal when compared with the First Amendment interests at stake," he dismissed the suit.

Time argues that the public findings of the Kahan Commission, which the article reports without challenge by Sharon, injured his reputation "beyond the capacity of the clause here complained of to augment." Defendant's Memorandum at 23. The opening page of the article prominently displays Sharon's picture in close proximity to the heading, "The Verdict is Guilty: An Israeli Commission Apportions the Blame for the Beirut Massacre." Article at 26. The text characterizes the Commission's report as "a stinging indictment of Defense Minister Ariel Sharon," and notes that the Commission had warned Sharon that he was "liable to be harmed" by its findings. *Id.* The article says that the Commission "reserved its strongest condemnation" for Sharon, and quotes in text the report's finding that Sharon had admitted that the danger of Phalangist atrocities " 'did not concern him in the least' " and that " '[t]he Defense Minister made a grave mistake.' " *Id.* at 29 (quoting Report at 15). The article highlights these judgments by placing the quotations in large type next to the picture of Sharon on the opening page. The article also reports the Commission's conclusion that Sharon's " 'blunders constitute nonfulfillment of a duty with which [he] was charged,' " and that he should " 'draw the appropriate personal conclusions,' i.e., resign or be fired." *Id.* at 29 (quoting Report at 15, 22). While Prime Minister Begin did not fire Sharon, the article recites that the Cabinet voted to accept the Commission's report, with only Sharon dissenting. This led Sharon to resign his post, though the Cabinet later voted to allow him to stay in the government as Minister without Portfolio. *Id.* at 26, 31–32. Finally, the article relates Sharon's own observation that " 'the mark of Cain' had been planted on

his forehead by the week's events." *Id.* at 32. According to Time, Sharon's admission that he now "bear[s] the stamp of the primal murderer" demonstrates that his reputation has already been wholly shattered. Defendant's Memorandum at 23.

Time makes a valid point in claiming that Sharon's reputation as a military and political leader was severely affected by the unchallenged facts and events reported in the article at issue. Nevertheless, his reputation cannot be said as a matter of law to have been so damaged by the reported events that he could recover only nominal damages for the article's potentially libelous statements.

The article itself recognizes that the Commission was guided in its conclusions by an extraordinary concept of "indirect" responsibility, and its findings and condemnations were based on the high moral standard it decided was appropriate for the occasion. Thus, although the Commission absolved Israel and all its officers, including Sharon, of any involvement in perpetrating the massacre or even of any intention to harm the noncombatant population, Report at 12, it concluded that "those who made the decisions [to send Phalangists into the camps] and those who implemented them are indirectly responsible for what ultimately occurred, even if they did not intend this to happen and merely disregarded the anticipated danger." Furthermore, the Commission imposed "a similar indirect responsibility ... on those who knew of the decision [for] it was their duty, by virtue of their position and their office, to warn of the danger, and they did not fulfill this duty," and upon those who learned of what was happening in the camps and "did not rush to prevent the continuation of the Phalangists' actions and did not do everything within their power to stop them." *Id.* The Commission recognized that, "from a legal perspective, the issue of responsibility is not unequivocal," but concluded "it is not our function as a commission of inquiry to lay a precise legal foundation for such indirect responsibility," and that in any event "as far as the obligations applying to every civilized nation and the ethical rules accepted by civilized peoples go, the problem of indirect responsibility cannot be disregarded." *Id.* In particular, the Commission found "a basis for such responsibility" in Deuteronomy, chapter 21, which requires a sacrifice by the elders of the city nearest a murder victim whose killer cannot be found,[2] and in the sufferings of the Jewish people, which often resulted from the failure of those in authority to accept responsibility for "pogroms perpetrated by various hooligans."[3] *Id.* The Commission suggested,

---

2. The Report states:
   A basis for such responsibility may be found in the outlook of our ancestors, which was expressed in things that were said about the moral significance of the biblical portion concerning the "beheaded heifer" (in the Book of Deuteronomy, chapter 21). It is said in Deuteronomy (21:6–7) that the elders of the city who were near the slain victim who has been found (and it is not known who struck him down) "will wash their hands over the beheaded heifer in the valley and reply: our hands did not shed this blood and our eyes did not see." Rabbi Yehoshua ben Levi says of this verse (Talmud, Tractate Sota 38b):
   The necessity for the heifer whose neck is to be broken only arises on account of the niggardliness of spirit, as it is said, "Our hands have not shed this blood." But can it enter our minds that the elders of a Court of Justice are shedders of blood. The meaning is, [the man found dead] did not come to us for help and we dismissed him, we did not see him and let him go—i.e., he did not come to us for help and we dis-

missed him without supplying him with food, we did not see him and let him go without escort. (Rashi explains that escort means a group that would accompany them; Sforno, a commentator from a later period, says in his commentary on Deuteronomy, "that there should not be spectators at the place, for if there were spectators there, they would protest and speak out.")
*Id.* at 12.

3. The Commission explained:
   When we are dealing with the issue of indirect responsibility, it should also not be forgotten that the Jews in various lands of exile, and also in the Land of Israel when it was under foreign rule, suffered greatly from pogroms perpetrated by various hooligans; and the danger of disturbances against Jews in various lands has not yet passed. The Jewish public's stand has always been that the responsibility for such deeds falls not only on those who rioted and committed the atrocities, but also on those who

in fact, that its high standard of responsibility might have led to adverse findings against the Lebanese Army, which refused urgent IDF requests that it act in the Phalangists' place, and against the International Peacekeeping Force, which the Commission found had departed Beirut too quickly after the PLO evacuation. *Id.* at 12–13.

The Commission went even beyond adopting the principle of "indirect responsibility" in developing a basis for holding Israeli officials accountable. The standard imposed upon Sharon's conduct was not whether he had adopted reasonable measures to prevent the massacre, but whether he had taken "all possible steps" to prevent harm to civilians. *Id.* at 13. Moreover, the Commission expressly refused to accord any deference to the political and military judgments of Israel's ministers, despite "the fact that there exists no hard and fast law stating that a public authority must reach its decision on the basis of correct and reasonable considerations after examining all matters brought before it in a proper manner." *Id.* at 14. While the Commission stated "the principle that the court does not substitute its own judgment for the judgment of the public authority and usually does not intervene in the policy that the authority sets for itself," the Commission explicitly imposed a standard more stringent even than negligence in evaluating the conduct of Israeli officials. The Commission found that "the matter under discussion is the deliberations of a commission of inquiry that is obligated to consider not necessarily the legal aspects of the subject but also, and occasionally primarily, its public and moral aspects." It therefore deemed accountable any official who acted inefficiently, unwisely, hastily, or even shortsightedly:

> were responsible for safety and public order, who could have prevented the disturbances and did not fulfill their obligations in this respect. It is true that the regimes of various countries, among them even enlightened countries, have side-stepped such responsibility on more than one occasion and have not established inquiry commissions to investigate the issue of indirect responsibility, such

The absence of any hard and fast law regarding various matters does not exempt a man whose actions are subject to the scrutiny of a commission of inquiry from accountability, from a public standpoint, for his deeds or failures that indicate inefficiency on his part, lack of proper attention to his work, or actions executed hastily, negligently, unwisely, or shortsightedly when—considering the qualifications of the man who holds a certain office and the personal qualities demanded of him in fulfilling his duties— he should have acted perspicaciously. *Id.*

The Commission imposed what it termed "personal" responsibility upon Sharon, but only on the basis of the uniquely stringent standards it applied. In addition to finding that Sharon had "absolutely no direct responsibility," *id.* at 13, it expressly found that he learned of the massacre at a time when no action on his part could reasonably have been expected. *Id.* at 15. It also accepted the proposition that reliance on the Phalangists to clear Sabra and Shatilla of terrorists was justified, among other reasons to prevent further Israeli casualties in what was essentially a Phalangist cause. Furthermore, it expressly found that the Israeli secret service (Mossad) and numerous officials shared Sharon's view that the recently reconstituted Phalangist forces could be expected to perform responsibly, and that warnings were given the Phalangist leaders by Major General Drori (commander of the IDF in Lebanon) and Brigadier General Yaron (IDF commander in Beirut and on the scene near Sabra and Shatilla) to avoid harming civilians. Nevertheless, the Commission concluded that all those who failed to anticipate the bloody acts of revenge should have done so in light of common knowledge and experience, and that Sharon's high and responsible of-

> as that about which we are speaking; but the development of ethical norms in the world public requires that the approach to this issue be universally shared, and that the responsibility be placed not just on the perpetrators, but also on those who could and should have prevented the commission of those deeds which must be condemned.
> *Id.*

fice required him to have foreseen this possibility and to have acted to prevent its occurrence by personally ordering the Phalangist commanders on the scene that no civilians be hurt. The Commission recognized the crucial importance of two radio calls from Phalangists within the camps to their commanders at an IDF observation point, asking what should be done with civilians they had rounded up. The Phalangist commanders, the Commission found, ordered the civilians killed.[4] Sharon was faulted for this, even though he was in Tel Aviv at the time, because the Commission felt his special authority would have enabled him to obtain results where Drori and Yaron had failed:

> It is a highly reasonable assumption that had the commanders who gave that reply heard from the Defense Minister or from higher Phalangist commanders a clear and explicit order barring harm to civilians and spelling out the damage this was liable to cause the Phalangists, their reply to these questions would have been different.

*Id.*

In short, the Commission condemned Sharon, not because he acted illegally or even immorally, but because he was guilty of a "grave mistake" and of "blunders" constituting nonfulfillment of his uniquely important duties, thereby causing embarrassment and harm to the State of Israel. *Id.* The damage done to Sharon's reputation by this condemnation lies, therefore, not in any misconduct on his part, but in the seriousness of the occasion on which he was found to have blundered, and for which he was therefore deemed indirectly responsible.

The Commission's ethical premises, and the high standard of conduct it imposed upon Sharon, are no doubt worthy of the praise lavished upon that distinguished body by *Time* and the civilized world. But the effects on Sharon's reputation of determinations based on such premises cannot

as a matter of law be equated with the effects normally imputed to verdicts in criminal cases. Verdicts rendered in criminal cases, that have led courts to find some convicted defendants libel proof to further claims of wrongdoing, rest upon the application of conventional standards of legal responsibility, rather than the standards, rooted in Deuteronomy and in the special sufferings of the Jewish people, which informed the Commission's perspective. Moreover, condemnations in criminal cases have profound reputational effects because criminal convictions are reviewed by politically independent, higher courts, rather than by the executive arm of a government facing what the Commission described as the "public furor [that] erupted in Israel and abroad." *Id.* at 10. Thus, while the Israeli Cabinet's acceptance of the Commission report added to the report's credibility, it could not transform the nature or reputational consequences of the Commission's condemnation.

No finding or statement in the report or in the article is comparable in its seriousness and potential reputational impact to the statement upon which this suit is based. Though the Commission seemed dubious of Sharon's claim that the danger of atrocities did not concern him, *see id.* at 15, at no point did it find Sharon had lied. Furthermore, while the *Time* article states that Sharon resigned as Defense Minister because of the Cabinet vote, Sharon nevertheless chose to resign, and was simultaneously offered another Cabinet position with the potential for continuing influence. Sharon remains a Minister today; and the article recites that he is still respected by many people, presumably for a lifetime of public service and achievements, particularly in military combat. Article at 31–32.

Finally, Time cannot reasonably rely on Sharon's public complaint that the Commission's condemnation placed upon him "the mark of Cain" in attempting to show he was already regarded as a liar and abet-

---

**4.** The Phalangist commander, Elie Hobeika, was found to have been asked by an officer what he should do with 50 women and children. Hobeika replied: "This is the last time you're going to ask me a question like that, you know exactly what to do," leading to "raucous laughter" among Phalangist personnel. *Id.* at 6. Another, unidentified commander replied to a similar request concerning 45 people: "Do the will of God." *Id.*

ter of murder before the alleged libel was published. Sharon's exaggerated protest no doubt stemmed from his having been deemed accountable even indirectly for so heinous an event in human history. His interpretation of Time's alleged libel, which Time has taken great pains to show can also be exaggerated, is that it was intended to convey the impression that he had approved or solicited the massacre, not merely blundered in failing to anticipate and prevent it. Time will have the opportunity in due course to present evidence to support its argument that the reputational harm inflicted by the Commission must be considered in determining what monetary damages Sharon might be entitled to recover for reputational damage done by the article. But the limited nature of the Commission's condemnation cannot be said to have so severely harmed Sharon's formidable reputation as to render him libel proof to suggestions in the article that he anticipated but did not act to prevent the massacre or that he actually instigated such acts, or that he lied to the Commission, or that the Commission found that he lied but attempted to cover up his complicity in the massacre. The facts here therefore do not fit the "limited, narrow" doctrine of the libel-proof defendant, *Buckley*, 539 F.2d at 889; the reputational interests at stake are substantial enough to warrant putting Time to the burden of defending its statements.

### III. *Special Damages*

Plaintiff has alleged no special damages, and Time claims this renders his complaint deficient. The requirement that special damages be alleged in libel suits persists in New York, but the precedents leave uncertain the types of cases in which it applies. The settled rule is that special damages must be alleged unless the alleged falsehood is libel per se. *Hinsdale v. Orange County Publications, Inc.*, 17 N.Y.2d 284, 270 N.Y.S.2d 592, 217 N.E.2d 650 (1966). But the parties here dispute what is meant by "libel per se." Apparent-

ly, a statement defamatory on its face, without proof of extrinsic facts, is libel per se, and a publication defames " 'if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community,' [or] to disparage [him] in the way of his office, profession or trade." *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 600–01, 132 N.E.2d 860 (1956) (quoting *Mencher v. Chesley*, 297 N.Y. 94, 100, 75 N.E.2d 257 (1947)); *see Tracy*, 5 N.Y.2d at 135–36, 182 N.Y.S.2d at 3, 155 N.E.2d at 854; *Rinaldi*, 42 N.Y.2d at 379, 397 N.Y.S.2d at 949, 366 N.E.2d at 1304–1305; *Sweeney v. Schenectady Union Publishing Co.*, 122 F.2d 288, 290 (2d Cir.1941), *aff'd*, 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942).

No need exists in this case to consider the exceptions to this rule under which some statements are treated as libel per se even though proof of extrinsic facts is needed to establish their defamatory character. *See, e.g., Hinsdale, supra;* W. Prosser, *The Law of Torts* 762–63 (2d ed. 1971). The statements sued upon here are defamatory on their face—*i.e.*, without a need to prove extrinsic facts—when read as part of the article in which they appeared. They are reasonably subject to a construction that would hold Sharon up to contempt and disparage him in his profession. Furthermore, no need exists here to unravel all the niceties of Time's argument concerning the meaning of "innuendo" under New York law. If a statement is susceptible to a construction which is libelous per se, then special damages need not be alleged, even though that construction might depend upon the drawing of inferences or the application of simple logic or common sense.[5] The libels here alleged are well within the group of serious and hence presumptively damaging statements upon which the courts have traditionally allowed suit without allegations designed to establish that the claim is worth litigating. *See, e.g., November*, 13 N.Y.2d at 177–79, 244 N.Y. S.2d at 310–12, 194 N.E.2d at 127 (charge

---

**5.** Time's argument confuses inference and innuendo, albeit with some assistance from the

cases. *See, e.g., Tracy,* 5 N.Y.2d at 136, 182 N.Y.S.2d at 3–4, 155 N.E.2d at 854–855. A state-

of "unethical" and "highly unprofessional" conduct by attorney); *Tedeschi v. Smith Barney, Harris Upham & Co., Inc.,* 548 F.Supp. 1172, 1175 (S.D.N.Y.1982) (employee broker falsely said to have been "discharged" and to possess "questionable loyalty and ethics"); *Rudin v. Dow Jones & Co.,* 510 F.Supp. 210, 213–16 (S.D.N.Y. 1981) (calling attorney "mouthpiece" might reasonably imply lack of professional integrity).

Defendant's motion to dismiss is denied.

So Ordered.

ment may cast charges without straightforwardly labeling its subject an abetter of murder or a liar. In determining whether an allegedly libelous statement is reasonably susceptible of a defamatory interpretation, the court does not presume the jury, as reasonable reader, wholly wanting in common sense and simple logic. Even though the defamatory interpretation flows from inference, implication, or insinuation, a jury might still properly find the statement defamatory on its face so long as these resonances are reasonable in light of the ordinary meaning of the words employed in the context in which the statement appears. *See* R. Sack, Libel, Slander, and Related Problems 50–51 (1980). Only if the defamatory interpretation depends upon reference to extrinsic facts does "innuendo," the logical connection between the statement and the extrinsic fact, come into play. *See Cole Fischer Rogow, Inc. v. Carl Ally, Inc.,* 29 A.D.2d 423, 288 N.Y.S.2d 556, 562 (1st Dept.1968), *aff'd,* 25 N.Y.2d 943, 305 N.Y. S.2d 154, 252 N.E.2d 633 (1969); Sack at 50–51, 98–99; W. Prosser, The Law of Torts 748–49 (2d ed. 1971); 1 E. Seelman, The Law of Libel and Slander in the State of New York 573–75 (1964).

Despite its choice of terms, the *Tracy* court was clearly concerned with susceptibility—whether defamatory inferences, in the sense described here, could reasonably be drawn from the challenged statement. Both inference and innuendo might "explain matter that is insufficiently expressed," 5 N.Y.2d at 136, 182 N.Y.S.2d at 3, 155 N.E.2d at 854, and the court's preliminary recitation of the standard definition of libel per se indicates that it saw no issue of special damages.