**Ariel SHARON, Plaintiff,**

v.

**TIME, INC., Defendant.**

**No. 83 Civ. 4660 (ADS).**

United States District Court,
S.D. New York.

Sept. 5, 1984.

Shea & Gould, New York City, for plaintiff; Milton S. Gould, Bernard D. Fischman, Richard M. Goldstein, Adam B. Gilbert, Andrea Feller, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant; Thomas D. Barr, Robert S. Rifkind, Stuart W. Gold, Ellen S.

Oran, Anne E. Verdon, New York City, of counsel.

## MEMORANDUM OPINION

SOFAER, District Judge.

On June 12, 1984, shortly before the first deposition of the plaintiff, which was limited to document discovery, the defendant submitted a "Statement of Relevant Issues for Purposes of Discovery From Plaintiff" ("Defendant's Statement"). On August 17, 1984, plaintiff submitted a "Memorandum in Response to Certain Portions of 'Defendant's Statement of Relevant Issues for Purposes of Discovery From Plaintiff'" ("Plaintiff's Memorandum"). Plaintiff's Memorandum sought to ban defendant from engaging in discovery concerning, or from using at trial, evidence of "alleged past misconduct" by General Sharon. Plaintiff's Memorandum at 13. Because the deposition of plaintiff on the merits is fast approaching, and to encourage the efficient handling of that deposition and all other pending discovery, this memorandum addresses the extent to which plaintiff's prior conduct is properly discoverable.

We must begin with what this case is about and what it is not about. The plaintiff, General Ariel Sharon, former Minister of Defense of the State of Israel, charged that TIME Magazine libeled him in its February 21, 1983 article, "The Verdict Is Guilty" ("article"). That article described the findings in the Final Report of Israel's Commission of Inquiry into the Events at the Refugee Camps in Beirut ("Commission" and "Report") concerning the massacre of Palestinians at Sabra and Shatilla. The Report strongly criticized General Sharon's behavior during these events. TIME quoted several statements about the plaintiff contained in the Report, including the fact that "[i]t was the duty of the Defense Minister to take into account ... that the Phalangists were liable to commit atrocities and that it was necessary to forestall this possibility as a humanitarian obligation and also to prevent the political damage it would entail.... [W]e know that this consideration did not concern him

in the least," and that his "blunders constitute nonfulfillment of the duty with which [he] was charged." Article at 29. Moreover, the article also reported General Sharon's difficulties within the Israeli Cabinet, including two acrimonious exchanges in which other Ministers criticized plaintiff's behavior. *Id.* at 31–32.

General Sharon does not, however, claim that any of this material was libelous, despite its strongly critical tone. His Complaint challenges only one paragraph of the article:

> One section of the report, known as Appendix B, was not published at all, mainly for security reasons. That section contains the names of several intelligence agents referred to elsewhere in the report. TIME has learned that it also contains further details about Sharon's visit to the Gemayel family on the day after Bashir Gemayal's assassination. Sharon reportedly told the Gemayels that the Israeli army would be moving into West Beirut and that he expected the Christian forces to go into the Palestinian refugee camps. Sharon also reportedly discussed with the Gemayels the need for the Phalangists to take revenge for the assassination of Bashir, but the details of the conversation are not known.

TIME article at 29; *see* Complaint ¶ 6. He alleges that this statement was false and defamatory in two respects: first, that it depicted him as having "encouraged" the Phalangists to massacre the Palestinians, *id.* ¶ 7; second, that it stated that the Commission had made a secret finding that he had encouraged or condoned the massacre, *id.* ¶ 8.

In a previously reported opinion, *Sharon v. Time, Inc.*, 575 F.Supp. 1162 (S.D.N.Y. 1983), this court denied defendant's motion to dismiss. The court found, first, that the statement was capable of a defamatory meaning, since it "could suggest to a reasonable reader that General Sharon had at least condoned the massacre," *id.* at 1166, and since its inconsistency with General Sharon's defense before the Commission—

that he had never considered a slaughter in the camps to be a real possibility—"suggest[ed] ... clearly that a Minister of Defense lied under oath," *id.* at 1167. Furthermore, the opinion found that General Sharon was not "libel proof," because the article made a charge against him that was qualitatively different from and more critical than the findings and criticisms made in the Report (and therefore capable of causing him incremental damage), *id.* at 1168–72.

## I. *What TIME Seeks To Discover*

Defendant's Statement contains ten general categories of information it seeks to discover from the plaintiff:

1. General Sharon's record of and reputation for "vicious brutality toward Arab civilians," Defendant's Statement at 1;

2. his record of and reputation for "dishonesty," *id.;*

3. his record of and reputation for "excessive personal political ambition and a willingness to use any means to advance his political career," *id.;*

4. his determination to make war in Lebanon and his role in expanding the war beyond the scope authorized by the Prime Minister and the Israeli cabinet, *id.* at 3;

5. the impact on General Sharon's reputation of "media coverage of his conduct of and responsibility for the war in Lebanon," *id.;*

6. his "plan to use the Phalange in Sabra and Shattila [*sic*]," *id.* at 6;

7. the impact on General Sharon's reputation of "media coverage of his conduct of and responsibility for the massacre at Sabra and Shatilla," *id.* at 7;

8. the "[i]nvestigation and report of the Kahan Commission," *id.* at 9;

9. the impact on General Sharon's reputation of the "Report and media coverage of the Report and its recommendations," *id.* at 9; and

10. financial information relevant to the issue of General Sharon's damages claim, *id.* at 10.

Decisions about the admissibility of particular pieces of evidence—and the purposes for which they may be admitted—must obviously be deferred until those questions are presented to the court in a more concrete form. Nevertheless, TIME has already made clear both in Defendant's Statement and in its "Schedule of Documents," appended to the Letter of Request for International Judicial Assistance sent to the Israeli Director of Courts on August 22, 1984, that TIME may attempt to discover and introduce at trial evidence which cannot under any theory be admissible on the question of the truth or falsity of its article. Some of the evidence TIME seems likely to offer, however, may be admissible on the question whether, assuming the article was false and defamatory, TIME published it with actual malice, as well as on the proper measure of damages, if plaintiff proves both falsity and malice.

Efforts to discover evidence on all the relevant issues will be permitted. On the other hand, Defendant's Statement makes clear that TIME apparently intends to seek some information which is not properly discoverable because it will not lead to the development of evidence admissible on *any* of the relevant issues. Efforts to discover such information will not be permitted.

## II. *Information on Which Full Discovery Is Proper*

Several of the categories in Defendant's Statement contain information which TIME is properly entitled to discover. The core issues in this case are General Sharon's involvement with and responsibility for the events at Sabra and Shatilla, and the Commission's statements, both published and unpublished, about General Sharon's behavior. First, TIME must be permitted to discover any unprivileged information about what the Report stated with respect to the details of General Sharon's meeting with the Gemayels. TIME must also be permitted to develop in full General Sharon's version of that meeting and of any discussions he may have had relating to the "need for the Phalangists to take

revenge" or to the desirability of the Phalangists' entering the camps.

Thus, TIME may seek any non-privileged information which General Sharon possesses which bears upon his alleged plan to use the Phalange in Sabra and Shatilla. Defendant's Statement at 6. This includes, for example, General Sharon's account of what communications, if any, he had with the Phalangists in the period prior to, during, and immediately after the massacres; his knowledge about the Phalangists during the relevant time period; his assessment of the possibility of Phalangist misconduct in the camps at the time the Israeli Defense Forces ("IDF") contemplated permitting them to enter and actually allowed them to enter; the time at which he discovered what was actually happening in the camps; and what actions he took in response to that discovery. (This listing is not exclusive, but is intended to illustrate the type of information legitimately discoverable.) In addition, TIME is entitled to all non-privileged information in General Sharon's possession concerning the Kahan Commission Report including, specifically, "Sharon's testimony" and the "[p]reparation of his testimony and that of others." *Id.* at 9.

Plaintiff's obligation to provide information on these matters may perhaps be limited by Israeli security laws. Plaintiff has been ordered to brief the relevance and effect of these laws to the information sought by defendant. He has the burden of showing their applicability to items he contends he should not be required to disclose.

■ Defendant's other categories also include some items on which TIME may legitimately examine General Sharon. Plaintiff's claim for $25,000,000 in compensatory damages entitles TIME to inquire into his finances to the extent necessary to know the bases for his claim. In this case, however, General Sharon has already stipulated on the record that his ability to earn money, as a government official or as a farmer, has not been affected by TIME's story. He has voluntarily restricted his claim, therefore, to the injury done to his statute as a national leader and to his reputation as a military hero, as well as the future lost opportunities that such damage may have predictably caused. Defendant must conduct discovery accordingly, approaching the damages issue as one that is related exclusively to stature and reputation.

■ As to the issues of stature and reputation, TIME will be permitted to discover and introduce on the damages issue, and perhaps also on the issue of malice, the impact on General Sharon's reputation of media coverage of his involvement with the events at Sabra and Shatilla, and of the Commission's Report. Here, too, however, defendant's counsel should avoid wasting time by merely asking plaintiff if he is aware of various potentially admissible reports on his reputation. *Cf. Pauling v. News Syndicate Co.,* 335 F.2d 659, 665–68 (2d Cir.1964) (permitting examination at trial of plaintiff concerning other persons' statements about his reputation, but commenting that the court "[did] not understand why defense counsel chose to get [them] before the jury in the way he did"), *cert. denied,* 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (1975). Defense counsel may well develop other approaches to this proper subject of inquiry.

### III. *Information on Which Discovery Will Be Limited*

■ The other five categories upon which defendant believes it may properly examine plaintiff all concern what may roughly be termed "other acts." No information from any of these categories would directly prove either that General Sharon in fact had the conversation with the Gemayels which TIME reported or that the Report described the details of such a conversation. Instead, defendant presumably believes that these issues provide circumstantial evidence that either would tend to prove the truth of the two statements TIME made or its lack of actual malice in making them. For the reasons outlined below, only those aspects of these catego-

ries which may shed relevant light on TIME's lack of actual malice, or on the question of damages, are properly discoverable.

### A. *The Applicable Standard*

The leading New York decision on the admissibility of evidence of "other acts" in a libel case is *Crane v. New York World Telegram Corp.*, 308 N.Y. 470, 126 N.E.2d 753 (1955). The defendants in *Crane* had published a story about the plaintiff stating that he was "under indictment." Their first defense was that the phrase "under indictment" did not require them to prove that plaintiff had actually been indicted by a grand jury (and he admittedly had not been officially charged), since his public reputation was such that he was widely suspected of various forms of wrongdoing. This defense was rejected. *Id.* at 473–76, 126 N.E.2d at 756–57. As a second, partial defense in mitigation of damages, defendants sought to introduce the same evidence of plaintiff's malfeasance during his tenure as head of the firemen's association, on the rationale "that 'the facts' were widely known, that plaintiff's general reputation was bad, and that all such matters were known to defendants, relied upon by them and made them believe in the truth of the item in question." *Id.* at 476, 126 N.E.2d at 757.

The Court of Appeals refused to admit the evidence because the facts alleged by the defendants were "totally unrelated to the truth" of the libel sued upon. *Id.* at 477, 126 N.E.2d at 758. The Court held:

> [T]he rule is clear that, while defendant may offer proof of plaintiff's bad general reputation prior to the publication, to reduce the value of the injured interest, he may not plead or prove for that purpose "specific acts, or instances, of plaintiff's misconduct" having no connection with the charge of the libel. Such specific misconduct, we have seen, may be admitted only if it also tends, but fails, to prove the truth of the libel's charge.

*Id.* at 478, 126 N.E.2d at 758 (citations omitted). The Court went on to reject "[t]he entire thrust and purport" of the proposed defense which it found was "to establish defendants' belief in the truth of a *different charge than the one made by the writing." Id.*, 126 N.E.2d at 758 (emphasis added). It made clear, however, that nothing in its opinion would preclude defendants from properly pleading matters "in mitigation of those [damages] that are punitive in character," *id.* at 479, 126 N.E.2d at 759—in other words damages stemming from common-law malicious publication.

▆▆▆ *Crane* was decided before the series of landmark Supreme Court cases beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). These more recent cases expanded the protection afforded statements about public officials and public figures. Truth remains an absolute defense in virtually all cases. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 151, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967) (Harlan, J.); *Lawlor v. Gallagher Presidents' Report, Inc.*, 394 F.Supp. 721, 728 (S.D.N.Y.1975), *remanded on other grounds*, 538 F.2d 311 (2d Cir.1976). In addition, a press defendant is insulated from liability unless a public-figure plaintiff can prove, with "convincing clarity," *New York Times Co.*, 376 U.S. at 285–86, 84 S.Ct. at 728–729, that the defendant acted with "actual malice," that is, "with knowledge that [the statement involved] was false or with reckless disregard of whether it was false or not," *id.* at 280, 84 S.Ct. at 726. The question whether a defendant acted with actual malice is a subjective one:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (emphasis added); *see Herbert v. Lando*,

441 U.S. 153, 160–65, 99 S.Ct. 1635, 1640–1643, 60 L.Ed.2d 115 (1979).

In light of the fact that truth and lack of actual malice are equally effective defenses to suits by public figures, the rule enunciated in *Crane* must be interpreted to allow the admission of evidence of specific misconduct that tends to prove not only the truth of the libel's charge but also the absence of actual malice.

## B. *Evidence of Prior Similar Acts*

Evidence concerning General Sharon's alleged record of "vicious brutality toward Arab civilians," Defendant's Statement at 1, is properly discoverable to the extent that it concerns incidents similar in kind to the events which occurred at Sabra and Shatilla. The requirement that these events be similar places a significant limit on the scope of defendant's inquiry. This case is not a trial of General Ariel Sharon's character or of his military career. To the extent that his conduct falls within the limits established by the Geneva Convention or other international law, General Sharon's arguable lack of sensitivity toward Arabs and his treatment of Arab civilians, as well as his alleged readiness to cause Israeli casualties, morally objectionable as these traits might seem to many people, are qualitatively different from the allegation about which he complains in this case: that he knowingly participated in a slaughter of civilians condemned by international law. The contention that General Sharon delighted in the "kills" of Palestinian guerillas, *see* Defendant's Statement at 1–2 (citing Newsweek, June 21, 1982), for example, sheds no real light on whether he was culpably involved in behavior which he himself has denounced as falling outside the limits of international law and human decency. Had the Phalangists only killed armed terrorists in Sabra and Shatilla, however enjoyably, their conduct might have been judged brutal, but not a violation of the laws of war. TIME may not inquire into General Sharon's legitimate military conduct either during his career in the IDF or during his tenure as Minister of Defense.

By "similar acts," the court limits defendant to those actions referred to in Defendant's Statement's first category—acts which go beyond the accepted normal bounds of international law as it relates to war and terrorism. Such actions might include, for example, General Sharon's possible participation in the events at Katna and Kibia in 1953, in which TIME appears to allege that defenseless women and children were blown up while trapped in the cellars of houses, *see* Defendant's Statement at 1, and other such reprisals against innocent civilians. Before pursuing each subject of inquiry, TIME must be able to represent that it has a basis for attempting to prove that General Sharon authorized, condoned, or participated in an action analogous to that of the Phalangists at Sabra and Shatilla.

The admissibility of particular evidence of past misconduct must finally be decided after an adequate record has been made. Meanwhile, the general rule to be followed in this litigation will be that evidence of prior acts is inadmissible on the issue of truth, but will be admitted when the jury considers the issue of actual malice.

The reason evidence of past misconduct is generally inadmissible on the question of truth is that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed.R.Evid. 403. Rule 404(b) of the Federal Rules of Evidence deals with evidence of "other crimes, wrong, or acts." Although Rule 404 is usually employed in criminal cases, the Advisory Committee Notes expressly contemplate the Rule's applicability to civil cases as well. *See Crumpton v. Confederation Life Insurance Co.*, 672 F.2d 1248, 1252–53 (5th Cir.1982) (applying Rule 404(a) in civil trial where the issue involved—whether the insured had been killed by a woman he had earlier raped—rendered trial "in most respects similar to a criminal case"); *Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d

516, 525–26 (10th Cir.) (excluding evidence under Rules 401(a) and (b) of other acts of football violence and plaintiff's reputation as a dirty player from trial where plaintiff alleged that player for defendant intentionally hit him), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 188 (1979). As Justice Jackson noted in *Michelson v. United States,* 335 U.S. 469, 476, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948), such evidence is not excluded because it is irrelevant: "on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." Thus, for example, in *Doran v. Priddy,* 538 F.Supp. 454 (D.Kans.1981), a slander action involving defendant's statement that plaintiff was a "little whore," the court excluded evidence of plaintiff's alleged extramarital affairs "lacking the element of prostitution, as the evidence is irrelevant as to the truth or falsity of whether she was a 'whore,' and is also highly prejudicial under Section 403 of the Federal Rules of Evidence." 538 F.Supp. at 455.

 In this case, allowing evidence of past brutality toward Arab civilians to be admitted to prove the truth of TIME's assertion about General Sharon's statement during his condolence call at the Gemayels' home would effectively allow defendant to present evidence of plaintiff's character "to show that he acted in conformity therewith," the purpose explicitly forbidden by Rule 404(b). Moreover, none of the proper purposes under the Rule, such as proof of motive or absence of mistake, has been suggested at this point to apply in this case. Just as the proscriptions of Rule 404(b) may be set aside in those extraordinary cases where there is proof of the existence of a common scheme whose various acts are so similar that proof of one act tends to constitute proof of another, *see, e.g., United States v. Burkley,* 591 F.2d 903, 920 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979), so too New York law might permit the admission of such evidence if it helps to establish some element of a defendant's

burden of proof on the question of truth. TIME will be given an opportunity after discovery to make offers of proof that demonstrate the requisite level of similarity and probative worth.

Evidence of plaintiff's alleged past misconduct will generally be admissible, however, on the issue of defendant's malice, if the requisite foundation for such evidence is laid. Justice Harlan's plurality opinion in *Associated Press v. Walker,* the companion case in the Supreme Court to *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), provides the constitutional basis for admitting prior acts that might also be viewed as character evidence on the issue of actual malice. There, in considering whether the petitioner's behavior in running the dispatch complained of involved "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers," 388 U.S. at 155, 87 S.Ct. at 1991 (the equivalent of actual malice), Justice Harlan specifically referred to the fact that the report "would not have seemed unreasonable to one familiar with General Walker's prior publicized statements on the underlying controversy," *id.* at 159, 87 S.Ct. at 1993.

New York law before *New York Times Co. v. Sullivan* also contemplated the relevance of similar prior acts to the question of a defendant's malice. In *Crane,* the Court of Appeals explicitly recognized that issues concerning particular acts of conduct might be relevant on the question of punitive damages (*i.e.,* the question of common-law malice). 308 N.Y. at 479, 126 N.E.2d 753. The reason for this is that a defendant might in good faith have believed that the libelous statement was true because of his knowledge of prior acts. As early as *Bisbey v. Shaw,* 12 N.Y. 67 (1854), the Court of Appeals recognized that, even when evidence was inadmissible to prove the truth of slanderous words, it might properly be admitted "with a view of showing that the words were spoken in a mistaken belief of their truth, and accompa-

nied by an admission of their untruth." *Id.* at 71. (At that time in New York evidence in mitigation of damages that tended to prove the truth of the slander was not admitted because such evidence could unfairly prejudice the plaintiff, who would not be on notice that the defendant intended to plead justification.) The Court concluded that "[t]he evidence should have been submitted to the consideration of the jury ... to show that the words were spoken without deliberate malice...." *Id.* at 74.

The one New York case squarely addressing the question of what types of other acts are permissible to refute allegations of malice is *Hess v. New York Press Co.*, 26 A.D. 73, 49 N.Y.S. 894 (1898). There, the First Department refused to allow defendant to present evidence that the plaintiff was guilty of tax improprieties, bribery, and embezzlement to prove the truth of its statement that plaintiff was "not a decent candidate" for Congress or "able and clean" in his public and private life. It found that these facts were "entirely disconnected with the original libel," *id.* at 74, 49 N.Y.S. at 895, and it therefore "would be going very far, indeed, if extraneous matter could be pleaded ... [to show that] the defendant believed that the plaintiff was such a disreputable person that he was justified in applying to him any slanderous or opprobrious epithet of a general character," *id.* at 75, 49 N.Y.S. at 895. It made clear, however, that "considerable latitude in pleading" mitigation of damages should be allowed as long as the "[m]atter pleaded ... [was] such as tends to furnish some excuse for publishing the libel complained of ...." *Id.*

■ Although, as Judge Brieant has noted, ' "[a]ctual malice' is now a term of art having nothing to do with actual malice," *Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341, 1350 (S.D.N.Y.1977), the same concerns which motivated the state courts' treatment of "common law" actual malice seem applicable to the admissibility of evidence of past acts on the question of "constitutional" actual malice as well. TIME may well be able to argue that its

knowledge of General Sharon's prior "vicious brutality toward Arab civilians" tends to negate any inference of actual malice because its knowledge of these past instances shows that TIME personnel could reasonably have believed the truth of the information published in the article involved in this case. The actual malice inquiry is largely a subjective one, however, in which evidence of General Sharon's prior conduct will be admissible only if it was known by the relevant personnel at TIME before the article was published. Plaintiff therefore presses the point that no discovery of this sort should be allowed, since defendant's personnel either knew of these matters or did not. This point is valid to the extent that TIME will be required to make satisfactory offers of proof that relevant staff members were aware of prior similar acts by General Sharon at the time the article was prepared before engaging in discovery concerning them. Still, some inquiry by defendant on this subject may be appropriate because the actual truth or falsity of allegations of which TIME was aware may be relevant in assessing whether TIME acted reasonably in relying on that information. Defense counsel should bear in mind the tangential relevance of this discovery.

### C. *Evidence Concerning General Sharon's Veracity*

■ Defendant also seeks to examine plaintiff as to his reputation for "dishonesty." Plaintiff's reputation for truthfulness may be relevant in two senses—the jury's decision on the truth of TIME's account of the alleged meeting with the Gemayels may hinge on its assessment of General Sharon's credibility at trial, and part of the libel alleged is that General Sharon lied in his defense before the Commission. *See Sharon,* 575 F.Supp. at 1167. The importance of General Sharon's credibility cannot, however, justify an examination of potentially numerous controversial incidents in his career, or an attempt by defendant to create credibility issues out of General Sharon's descriptions of his actions or his denials of charges made against him. To

inquire into specific events as relevant on the issue of veracity, defendant must make offers of proof that discovery is justified because a question has previously been raised as to the truthfulness of General Sharon's statements. Defendant will be permitted to learn General Sharon's position with respect to such previously recorded allegations.

### IV. *Evidence on Which Further Discovery Will Not Be Permitted*

■ The foregoing discussion should have made clear that TIME will not be permitted to examine plaintiff concerning his alleged "excessive personal political ambition," or the extent to which he influenced Israeli actions in Lebanon, beyond particular events bearing directly on the two core issues—the "details" of his alleged conversation with the Gemayels and whether the Commission reported secretly on such details. That plaintiff's career has been fraught with controversy is no secret. Furthermore, TIME itself recites that he is "either a military genius or blood-thirsty megalomaniac depending on who you talk to in Israel." Defendant's Statement at 2 (quoting London Financial Times, June 12, 1982). That very observation demonstrates the pointlessness of pursuing the popular opinion of General Sharon. Such opinions have no probative value on the issues in this case. Nor will sufficient admissible evidence be obtained to justify unlimited examination of the specific instances which have given rise to strong feelings about General Sharon. For example, it is hard to fathom how his conduct during the battle of the Mitla Pass in 1956, referred to at length in Defendant's Statement at 5, could shed meaningful light on the questions at issue in this suit. His alleged disregard for Israeli troop casualties during war is not reliably probative of his attitude towards the wanton slaughter of innocent civilians. And any such proof would necessarily entitle General Sharon to attempt to prove his own version of the events involved, and arguably also to demonstrate that he acted no more cruelly or with no less regard for

value of human life than other respected or even revered generals or national leaders who have been responsible for inflicting heavy military or civilian casualties in war. In short, this case will not be transformed into a referendum by jury on General Ariel Sharon's military style or ability.

### V. *Conclusion*

The evidentiary issues already raised by the parties will no doubt become more refined after further discovery. The scope of discovery permitted under this memorandum may therefore need to be refined as well. In general, however, the issues in this case are clear: whether at General Sharon's meeting with the Gemayels he discussed the "need" for the Phalangists to avenge Bashir Gemayel's death, whether the Commission Report's secret appendices contain details of the meeting, whether TIME could reasonably have believed that such materials were in the appendices or that the details allegedly described were true, and, if the answer to all these questions is negative, whether and in what amount General Sharon is entitled to damages.

The significant differences in the evidence that will be admissible on truth or falsity, on the one hand, and on malice or damages, on the other, and the complications and likely inability of the jury to avoid giving improper consideration to some potentially prejudicial evidence in this case at this point makes a bifurcated trial seem more efficient and just than a single-stage trial. If a bifurcated trial is ultimately ordered, the first stage will concern only the question whether the article was false and defamatory. If the jury concludes that the article was false and defamatory, the second stage of the trial would consider whether TIME acted with actual malice and, if it did, the appropriate damage award. The parties should brief this issue before October 1, so a final decision can be made. During the pretrial process, however, discovery should proceed concerning any material properly discoverable on any issue at either possible stage of the

trial. Absent compelling circumstances warranting an exception, the parties will be required to conclude their discovery on all issues prior to the first stage of trial.

SO ORDERED.